Carl C. ICAHN, Plaintiff,

v.

**Roy BLUNT, Secretary of State of the State of Missouri, the State of Missouri, and Trans World Airlines, Inc., Defendants.**

No. 85–4279–CV–C–9.

United States District Court,
W.D. Missouri,
Central Division.

June 24, 1985.

Harvey M. Tettlebaum, Duane Benton, Jefferson City, Mo., Andrew Rothschild, Barry A. Short, Lewis & Rice, St. Louis, Mo., Weil, Gotshal & Manges, Irwin Warren, Dennis J. Block, Stephen Radin, New York City, Frederick H. Riesmeyer, II, James C. Wirken, Kansas City, Mo., for plaintiff.

Phillip K. Gebhardt, Mo. Atty. Gen., Jefferson City, Mo., for Blunt and State of Mo.

John C. Noonan, Stinson, Mag & Fizzell, Kansas City, Mo., Skadden, Arps, Slate, Meagher & Flom, New York City, Thomas J. Guilfoil, Jim J. Shoemake, J. Richard McEarchern, St. Louis, Mo., for Trans World Airlines, Inc.

---

## ORDER GRANTING DECLARATORY AND INJUNCTIVE RELIEF

BARTLETT, District Judge.

On May 30, 1985, shortly after the Governor of Missouri signed into law Senate Committee Substitute for House Bill No. 117 (H.B. No. 117), plaintiff, Carl C. Icahn filed this action seeking to enjoin the defendants Trans World Airlines, Inc. (TWA), Roy Blunt, the Missouri Secretary of State, and the State of Missouri from attempting to invoke or enforce H.B. No. 117, the Missouri Control Share Acquisition Statute, Mo.Rev.Stat. § 351.407, and the Missouri Takeover Bid Disclosure Act, Mo.Rev.Stat. Chapter 409, with respect to the purchase by plaintiff of shares of common stock of TWA.

On June 3, 1985, Icahn filed his amended complaint reasserting his request for injunctive relief and seeking a declaratory judgment that H.B. No. 117, the Missouri Control Share Acquisition Statute, and the Missouri Takeover Bid Disclosure Act are invalid because they violate the following provisions of the United States Constitution and the Missouri Constitution:

1) the Commerce Clause, U.S. Const., art. I, § 8, cl. 3 (Count I);

2) the Supremacy Clause, U.S. Const., art. VI, cl. 2 (Count II);

3) the right to freedom of contract guaranteed by the Fourteenth Amendment to the United States Constitution (Count III);

4) the right of alienation of property guaranteed by the Fourteenth Amendment to the United States Constitution (Count IV);

5) the Contract Clause, U.S. Const., art. I, § 10, cl. 1 (Count V);

6) the Full Faith and Credit Clause, U.S. Const., art. IV, § 1 (Count V);

7) Mo. Const., art. III, § 21, prohibiting the amending of a bill in its passage through either house so as to change its original purpose (Count VII);

8) Mo. Const., art. III, § 23, requiring that a legislative bill contain only one subject which is clearly expressed in its title (Count VIII); and

9) Mo. Const., art. III, § 40(28); Mo. Const., art. XI, § 2; and Mo. Const., art. I, § 13 prohibiting a grant of exclusive and special rights to a corporation (Count IX).

Also, plaintiff asserts a claim under 42 U.S.C. § 1983 for deprivation of rights, privileges, and immunities guaranteed by the Commerce Clause, the Supremacy Clause, the Contract Clause, the Fourteenth Amendment to the United States Constitution and by the Williams Act amendments to the Securities Exchange Act of 1934, 15 U.S.C. § 78m(d)–(e); 78n(d)–(f) (Count VI).

Besides disputing each of the constitutional challenges raised by Icahn, defendants argue that:

1) the claims asserted by Icahn are moot;

2) this Court is without jurisdiction because there is no case or controversy as required by Article III of the United States Constitution;

3) this Court is precluded from granting Icahn's requests for injunctive relief by the Anti-Injunction Act, 28 U.S.C. § 2283;

4) this Court should defer to pending state court proceedings under *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746 [27 L.Ed.2d 669] (1971); and

5) this Court should abstain from deciding Icahn's motion for injunctive relief under *Railroad Comm'n. of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643 [61 S.Ct. 643, 85 L.Ed. 971] (1941).

After a hearing on June 3, 1985, an Order was issued temporarily restraining the enforcement of H.B. No. 117. On June 12, 1985, the parties presented evidence on plaintiff's request for a preliminary injunction. At the conclusion of the evidentiary presentation, the parties announced that no further evidence would be presented on plaintiff's request for permanent relief. Therefore, it was agreed by all parties that the oral argument scheduled for June 18, 1985, would conclude the presentation of this case.

*The Parties*

Plaintiff Carl C. Icahn (Icahn) is a resident of the State of New York. On June 12, 1985, Icahn and entities controlled by Icahn owned 32.779% of the total outstanding shares of common stock of TWA. Icahn and his group stated in Amendment No. 3 to their Schedule 13D filed with the Securities and Exchange Commission on May 23, 1985, that they "have determined to seek control of the Issuer so as to protect their substantial equity interest." Plaintiff also disclosed in Amendment No. 3 that he had proposed a cash merger between TWA and a corporation to be formed by plaintiff "pursuant to which all holders of Shares (other than the Registrants and their affiliates) would receive $18 a Share in cash in exchange for their Shares."

If the Registrants' cash merger proposal is not accepted by the Issuer's Board of Directors, the Registrants intend to continue to explore strategies for seeking control. In this context, the Registrants intend to pursue the stockholder consent procedure referred to above and the Registrants (or any one of them) intend to acquire additional Shares (subject to availability of Shares at prices deemed favorable) from time to time in the open market, through a tender offer, in privately negotiated transactions or otherwise.

On June 17, 1985, Icahn filed with the Securities and Exchange Commission Amendment 8 to his Schedule 13D in which he commented as follows on his intentions in light of the announced merger agreement between Texas Air and TWA:

[O]n June 13, 1985, Carl C. Icahn issued a press release in which he stated, among other things, that he is not presently taking a position on the offer and does not presently intend to make a counter-bid or to purchase additional Shares, although Mr. Icahn reserved the right to do so. Mr. Icahn intends to continue to explore each of these possibilities including, specifically, the purchase of additional Shares in open market or privately negotiated transactions.

Defendant Roy Blunt is the Secretary of State of the State of Missouri and the public official expressly authorized by H.B. No. 117 to seek injunctive relief to secure compliance by certain foreign corporations with Missouri's Control Share Acquisition Statute.

TWA is a Delaware corporation with its headquarters in New York City. TWA is a common carrier engaged primarily in transporting people and cargo by air. As of March 1, 1985, there were 32,853,932 shares of common stock outstanding.

Lambert-St. Louis International Airport (Lambert Airport) in St. Louis, Missouri, is a major hub for TWA's domestic flight operations. TWA currently uses 30 of its 62 gates. TWA has 189 domestic departures daily from Lambert Airport and plans to increase the number of departures in the near future. TWA also provides non-stop international service from St. Louis to London, Paris and Frankfurt. TWA landings represent 45% of all landings at Lambert Airport. TWA generates 57.7% of all landing fees at Lambert Airport amounting to $6,619,000 annually. TWA has 4,232 employees in the St. Louis area. TWA utilizes and pays for 59% of the total terminal and concourse space which generates $4,537,-830 in revenue for Lambert Airport. According to the undisputed affidavit of the Assistant Director for Business and Finance of Lambert Airport, if TWA should cease to operate at Lambert Airport, St. Louis' ability to develop and maintain the physical plant necessary for convenient, safe, efficient and economical air travel would be jeopardized. Specifically, the maintenance and extension of the airfield and periodic maintenance on the entire complex would be threatened.

While expanding service out of St. Louis, TWA has reduced its number of departures from Kansas City. However, TWA's Kansas City Administrative Center processes a substantial part of the system-wide payroll, purchasing and disbursements. TWA's principal technical base for overhauling and servicing aircraft is located in Kansas City. Also, TWA's pilots, flight crews and cabin attendants are trained at the Kansas City Flight Training Center. TWA has 6,597 employees in the Kansas City area. TWA estimates that its purchases of materials, supplies, fuel, food and beverages from vendors in the Kansas City, Missouri, area during 1985 will amount to approximately $280,000,000. TWA's total contribution to the economy of the Kansas City area is more than $518,000,000 yearly.

Revenue bonds issued by Kansas City and St. Louis totalling in excess of $313,-000,000 have financed capital improvements at Lambert Airport and at Kansas City International Airport. In St. Louis, the City of St. Louis and TWA are parties to a long-term lease which St. Louis relied upon in extending the east concourse for TWA at a cost of $17,848,000 and a new cargo building at the cost of $5,607,000. The debt incurred for these capital improvements was financed through revenue bonds, which, if the anticipated revenue from TWA's operations was not to be realized, would have to be supported from other airport revenues. According to the affidavit of the Assistant Director of Lambert Airport, the future marketability of airport revenue bonds could be adversely affected if TWA were to leave Lambert Airport. Also, further development of Lambert Airport would be hindered if TWA terminated its St. Louis operations.

### The New York Action

On May 15, 1985, TWA commenced an action in the United States District Court for the Southern District of New York alleging that Icahn failed to make the disclosures required by § 13(d) of the Williams Act. After an evidentiary hearing, Judge Cannella ruled on May 28, 1985, that there was no substantial violation of § 13(d) ongoing at that time. Judge Cannella refused to enjoin Icahn from purchasing further TWA shares, voting his stock, soliciting proxies or consents, or making a tender offer.

### The St. Louis County Case

On May 16, 1985, TWA filed a petition in St. Louis County Circuit Court against Icahn and affiliated companies asserting claims for violations of the fraud provisions of the Missouri securities laws, breach of contract, fraud, breach of fiduciary duty, prima facie tort and conspiracy. On May 20, 1985, TWA amended its petition to add claims for negligence and reckless endangerment. Again, on May 31, 1985, TWA amended its complaint adding Count VIII seeking to enforce Missouri's Control Share Acquisition Statute as made applicable to foreign corporations by H.B. No. 117.

On May 31, 1985, Roy Blunt, Missouri Secretary of State, sought leave to intervene to secure Icahn's compliance with Missouri's Control Share Acquisition Statute. Later that day Judge Drumm granted the Secretary of State leave to intervene.

On June 3, 1985, Judge Drumm restrained Icahn from purchasing further TWA shares on grounds unrelated to the claims based on H.B. No. 117. On June 7, 1985, Judge Drumm entered an order which stated in part:

As the Court has previously advised the parties, proceedings on Count VIII

pertaining to certain alleged violations of §§ 351.447, 351.575.1 and 2 and 351.407, RSMo. (1985) and the constitutionality of House Bill 117 are currently being deferred due to the cause which is pending before the Honorable D. Brook Bartlett in the United States District Court for the Western District of Missouri.

On June 12, 1985, Judge Drumm dissolved the temporary restraining order. On June 13, 1985, Icahn and TWA agreed "to adjourn indefinitely" the proceedings including all discovery and the preliminary injunction hearing scheduled for June 17, 1985. The State of Missouri was not a party to this agreement. Neither TWA nor the State of Missouri has dismissed its claim seeking to enforce H.B. No. 117 in the St. Louis County case.

### Legislative Background of Senate Committee Substitute for H.B. No. 117

House Bill No. 117 (original H.B. No. 117) was prefiled on December 3, 1984. Original H.B. No. 117 was passed by the Missouri House on April 25, 1985. On May 6, 1985, original H.B. No. 117 was referred to the Senate Commerce Committee.

Beginning on May 29, 1985, legislative action on original H.B. No. 117 accelerated. On that day, original H.B. No. 117 emerged from the Senate Commerce Committee as Senate Committee Substitute for House Bill No. 117 (H.B. No. 117). The bill had gone from 35 words in the original H.B. No. 117 to over 1,600 words in H.B. No. 117.[1] Later that day, the rules were suspended and H.B. No. 117 was read for the third time and passed by the Senate.

The next day, May 30, 1985, the Senate and House appointed a conference committee. After the conference committee reported later that day, the House and the Senate passed H.B. No. 117. Still later

---

**1.** Original H.B. No. 117 was titled "An act Relating to the eligibility of certain contractors to bid on certain contracts" and provided in its entirety: "Section 1. No contractor domiciled outside the state of Missouri may submit a bid on any state contract or project until he has complied with all requirements of sections 351.570 to 351.650, RSMo, applicable to foreign corporations."

House Bill No. 117 had a new title: "An Act to repeal section 351.575, RSMo 1978, and Section 351.447, RSMo Supp. 1984, relating to certain corporations, and to enact in lieu thereof four new sections relating to the same subject, with an emergency clause for a certain section." The language of original H.B. No. 117 appears at the end of H.B. No. 117 in Section 2.

that day the President Pro Tem of the Senate, the Speaker of the House and the Governor signed H.B. No. 117 and it became effective immediately.

### Provisions of Mo.Rev.Stat. § 351.575 (H.B. No. 117)

Section 351.575.2 (H.B. No. 117) provides that the provisions of Missouri's Control Share Acquisition Statute (Mo.Rev.Stat. § 351.407) are applicable to those foreign corporations that are common carriers that have benefitted from physical facilities financed by Missouri political subdivisions and that have over 7,500 employees in Missouri.[2]

Section 351.575.3 (H.B. No. 117) authorizes the Missouri Secretary of State and the issuing corporation or its shareholders to seek injunctive relief to secure compliance with the provisions of H.B. No. 117 and the Control Share Acquisition Statute. In addition, § 351.575.4 (H.B. No. 117) authorizes the Missouri Secretary of State and the issuing corporation or its shareholders to seek injunctive relief with respect to any violation of the Missouri Takeover Bid Disclosure Act, Mo.Rev.Stat., Chapter 409.[3]

Section 351.575.5 (H.B. No. 117) provides that the Control Share Acquisition Statute is not applicable to a foreign corporation (even though it meets the criteria in § 351.-575.2) if a majority of the directors in office before the control share acquisition was proposed approves the control share acquisition. Mo.Rev.Stat. § 351.575.5 (H.B. No. 117).[4]

H.B. No. 117 became law immediately upon signing by the Governor of Missouri. The emergency clause stated that immediate action was necessary "to protect jobs, public investments and certain property."[5]

### Missouri's Control Share Acquisition Statute (§ 351.407)

Unless the articles of incorporation of an issuing corporation provide that § 351.407 does not apply to a control share acquisition, no control share acquisition shall be made without the prior authorization of the shareholders. Mo.Rev.Stat. § 351.407.1. Any person who proposes to make a control share acquisition must deliver to the corporation an "acquiring person statement" which discloses the information required by the statute. Mo.Rev.Stat. § 351.-407.2. A "control share acquisition" means the acquisition of a share or shares that would give the purchaser for the first time one of the designated levels of voting power. Mo.Rev.Stat. § 351.015(6).[6]

---

2. Counsel for defendants conceded at oral argument that TWA is the only corporation known to meet the requirements of § 351.575.2 (H.B. No. 117).

3. In *National City Lines v. LLC Corp.*, 687 F.2d 1122 (8th Cir.1982), and in *Empire, Inc. v. Ashcroft*, 524 F.Supp. 898, 906 (W.D.Mo.1981), Missouri Takeover Bid Disclosure Act, contained in Mo.Rev.Stat. ch. 409, was declared invalid under the Supremacy Clause of the United States Constitution, art. VI, cl. 2 and the Commerce Clause of the United States Constitution, art. I, § 8, cl. 3.

4. Mo.Rev.Stat. § 351.575.5 (H.B. No. 117) provides in its entirety:

Notwithstanding any other provision of this section, section 351.407 shall not apply to any foreign corporation if the control share acquisition has been approved, at a duly convened meeting by a majority of the directors of the issuing public corporation in office immediately prior to the first control share acquisition made or proposed to be made by the person engaging in such control share acquisition.

5. The emergency clause reads:

Because immediate action is necessary to protect jobs, public investments and certain property, section 351.575 of this act is deemed necessary for the immediate preservation of the public health, welfare, peace and safety and section 351.575 of this act is hereby declared to be an emergency act within the meaning of the constitution and section 351.-575 of this act shall be in full force and effect upon its passage and approval.

6. Mo.Rev.Stat. § 351.015(6) provides in part:

"*Control share acquisition*" means the acquisition, directly or indirectly, by any person of a share or shares of an issuing public corporation that, when added to all other shares of the issuing public corporation in respect of which such person may exercise or direct the exercise of voting power, would entitle such person, immediately after such acquisition, directly or indirectly, alone or with others, to, for the first time, exercise or direct the exercise of the voting power of the issuing public corporation in the election of directors within any of the following ranges of such voting power: one-fifth or more but less than one-

Within ten days after receipt of the acquiring person statement, the board of directors shall call a special meeting of the shareholders. The special meeting shall be held no sooner than thirty days and no later than fifty days after the statement is received. Mo.Rev.Stat. § 351.407.3.[7]

Before a purchaser can make a control share acquisition, two-thirds of all outstanding shares and two-thirds of all outstanding shares, excluding interested shares, must be voted in favor of the proposed control share acquisition. Mo.Rev. Stat. § 351.407.5.[8]

## MOOTNESS

Defendants argue that this case is moot because plaintiff has stated in Amendment 8 to his Schedule 13D that he does "not presently intend to purchase additional shares" and because plaintiff has agreed with TWA to "adjourn indefinitely" the preliminary injunction hearing in the St. Louis County case. As a result, defendants contend that there is no longer a justiciable case or controversy.

■ This Court's jurisdiction extends only to actual cases or controversies. U.S. Const., art. III, § 2. This Court has no jurisdiction to decide moot cases. *DeFunis v. Odegaard*, 416 U.S. 312, 316, 94 S.Ct.

1704, 1705, 40 L.Ed.2d 164 (1974). "Plaintiffs must demonstrate a 'personal stake in the outcome' in order to 'assure that concrete adverseness which sharpens the presentation of issues' necessary for the proper resolution of constitutional questions." *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983) (quoting from *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962)). Abstract injury is not enough. The plaintiff must show that he has sustained or is immediately in danger of sustaining some direct injury as a result of the challenged official conduct. The injury or threat of injury must be real and immediate, not conjectural or hypothetical. *Lyons*, 103 S.Ct. at 1665.

In *Super Tire Engineering Co. v. McCorkle*, 416 U.S. 115, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974), certain employers sought injunctive and declaratory relief against New Jersey state officials administering a state program providing welfare benefits to striking workers. The employers alleged that the interpretative regulations according benefits to the striking workers were void because they conflicted with federal labor policy and with the Social Security Act of 1935. At the hearing before the district court on a motion for a preliminary

---

third of such voting power, one-third or more but less than a majority of such voting power, or a majority or more of such voting power....

7. Mo.Rev.Stat. § 351.407.3 provides:
Within ten days after receipt of an acquiring person statement that complies with subsection 2 of this section, the board of directors of the issuing public corporation shall call a special meeting of shareholders of the issuing public corporation for the purpose of voting on the proposed control share acquisition. Unless the acquiring person agrees in writing to another date, such special meeting of shareholders shall be held within fifty days after receipt by the issuing public corporation of the acquiring person statement. If the acquiring person so requests in writing at the time of delivery of the acquiring person statement, such special meeting shall be held not sooner than thirty days after receipt by the issuing public corporation of the acquiring person statement. No proxies as respects the special meeting may be solicited by any per-

son prior to thirty days before the date of the special meeting without the written agreement to the contrary of both the acquiring person and issuing public corporation. Such special meeting of shareholders shall not be held later than any other special meeting of shareholders that is called, after receipt by the issuing public corporation of the acquiring person statement, in compliance with this chapter.

8. Mo.Rev.Stat. § 351.407.5 provides in part:
The acquiring person may make the proposed control share acquisition only if all of the following occur:
(1) The proposed control share acquisition is approved, at the special shareholders meeting held for that purpose, by the affirmative vote of at least two-thirds of the outstanding shares entitled to vote at such meeting under the provisions of the articles of incorporation of the issuing public corporation and also by the affirmative vote of at least two-thirds of all outstanding shares entitled to vote at such meeting after excluding interested shares....

injunction, the union intervened and contended that the case was moot because the strike was over. Nevertheless, the district court decided the case. The Supreme Court granted *certiorari* to consider the mootness issue, i.e., whether a case or controversy still existed within the meaning of Art. III, § 2 and the Declaratory Judgment Act.

Although agreeing that the request for injunctive relief against the state officials during the pendency of the strike had been mooted, the Supreme Court concluded that the employers and the state officials still retained sufficient interests and injury to justify the award of declaratory relief. *Id.*, 416 U.S. at 122, 94 S.Ct. at 1698.

> Unlike the situations that prevailed in *Oil Workers Unions v. Missouri*, 361 U.S. 363, 80 S.Ct. 391, 4 L.Ed.2d 373 (1960), on which the Court of Appeals' majority chiefly relied, and in *Harris v. Battle*, 348 U.S. 803, 75 S.Ct. 34, 99 L Ed. 634 (1954), the challenged governmental activity in the present case is not contingent, has not evaporated or disappeared, and, by its continuing and brooding presence, casts what may well be a substantial adverse effect on the interests of the petitioning parties.

*Id.*

> As in *Harris* and *Oil Workers*, the strike here was settled before the litigation reached this Court. But, unlike those cases, the challenged governmental action has not ceased. The New Jersey governmental action does not rest on the distant contingencies of another strike and the discretionary act of an official. Rather, New Jersey has declared positively that able-bodied striking workers who are engaged, individually and collectively, in an economic dispute with their employer are eligible for economic benefits. This policy is fixed and definite. It is not contingent upon executive discretion. Employees know that if they go out on strike, public funds are available.

*Id.* at 123, 94 S.Ct. at 1699 [footnotes omitted].

It was the remoteness of the threat of state action that convinced the court in *Oil Workers* to hold that case moot. In the case now before us, the state action is not at all contingent. Under the petitioners' view of the case, it is immediately and directly injurious to the corporate petitioners' economic positions. Where such state action or its imminence adversely affects the status of private parties, the courts should be available to render appropriate relief and judgments affecting the parties' rights and interests.

*Id.* at 125, 94 S.Ct. at 1699.

Similarly in this case, Missouri's policy as expressed in H.B. No. 117 is not contingent, and it has not evaporated or disappeared. Missouri still intends to make its Control Share Acquisition Statute applicable to foreign corporations meeting the criteria set forth in H.B. No. 117. TWA has agreed with Icahn to adjourn proceedings in the state case; TWA has not agreed unequivocally to cease attempting to enforce H.B. No. 117. TWA's request to enforce H.B. No. 117 still pends in the St. Louis County case. Furthermore, Missouri and its Secretary of State are not parties to the TWA-Icahn agreement "to adjourn indefinitely" the St. Louis County case. All that is needed to give this dispute the urgency it had from its inception is for plaintiff to decide to buy more TWA shares. In Amendment No. 8 Icahn states that he is considering several courses of action, including purchasing additional TWA shares on the open market or making a counter bid. Because plaintiff's present ownership (32.779%) is so close to the 33⅓% threshold that triggers application of the Missouri Control Share Acquisition Statute, any decision by plaintiff to buy more shares would subject him immediately to the provisions of the Missouri statute. Under plaintiff's view of this case, the "continuing and brooding presence" of H.B. No. 117 has a substantial effect on plaintiff's weighing of available options. House Bill No. 117 stands as an impediment to plaintiff deciding to continue his effort to gain control of

TWA by purchasing additional shares or by making a tender offer.[9]

■ Also, as in *Super Tire*, even if the existence of a case or controversy is dependent on the existence of a present intention by plaintiff to buy more TWA shares whether by open market purchase or tender offer, this case presents an issue that is likely to be repeated under circumstances that make judicial resolution difficult. Cases that are "capable of repetition, yet evading review" are a recognized exception to the mootness rule. *Super Tire*, 416 U.S. at 122, 94 S.Ct. at 1698.

■ Frequently time is of the essence in efforts to obtain control of a company by open market purchases or by a tender offer. From beginning to end the time span of a control of share acquisition is often only weeks or at most a few months. *See National City Lines, Inc. v. LLC Corp.*, 687 F.2d 1122 (8th Cir.1982) and *Empire, Inc. v. Ashcroft*, 524 F.Supp. 898 (W.D.Mo. 1981). An investor who proposes to make a control share acquisition needs to know whether to comply with the Control Share Acquisition Statute. Before the courts could furnish a definitive answer the investment opportunity could well have vanished.

The Supreme Court in *Super Tire*, stated that it has had no difficulty in rejecting mootness claims when governmental action continues to affect directly the behavior of citizens.

A strike that lasts six weeks, as this one did, may seem long, but its termination, like pregnancy at nine months and elections spaced at year-long or biennial intervals, should not preclude challenge to state policies that have had their impact and that continue in force, unabated and unreviewed. The judiciary must not close the door to the resolution of the important questions these concrete disputes present.

*Super Tire*, 416 U.S. at 126–127, 94 S.Ct. at 1700.

Similarly here, the door should not be closed to the resolution of the important questions presented by the dispute between these parties. House Bill No. 117 directly affects the behavior of the parties to this case and will continue to affect the behavior of citizens. Therefore, defendants' motion to dismiss this case for mootness is denied.

## THE FEDERAL ANTI–INJUNCTION ACT

TWA and the State of Missouri argue that the Federal Anti-Injunction Act, 28 U.S.C. § 2283, bars this Court from enjoining TWA and the State of Missouri from enforcing the provisions of H.B. No. 117 against Icahn because the same issues are pending in state court.

The Anti-Injunction Act, 28 U.S.C. § 2283, provides that "a court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments."

In *National City Lines, Inc. v. LLC Corp.*, 687 F.2d 1122 (8th Cir.1982), the appellants argued that the relief sought by National was barred by the Anti-Injunction Act. The Court rejected this argument because there was no pending state court action when National petitioned the federal court for injunctive relief.

9. The instant case is clearly dissimilar from *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) and *O'Shea v. Littleton*, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974) which are relied on by TWA. Here, one does not have to make multiple levels of speculation to conclude that a real and immediate threat to plaintiff exists from a fixed and definite state policy.

Also, *Iron Arrow Honor Society v. Heckler*, 464 U.S. 67, 104 S.Ct. 373, 78 L.Ed.2d 58 (1983) presents a vastly different situation. In *Iron Arrow*, the Court found that the university's unequivocal decision to ban Iron Arrow from the campus was the reason Iron Arrow was excluded, not the challenged action of the Secretary of Health and Human Services. Therefore, the dispute about the Secretary's regulations was moot. No such unequivocal intervening has occurred here.

The Anti-Injunction Act is inapplicable when a federal court has first obtained jurisdiction of a matter in controversy by the institution of suit. Notwithstanding the confines of the Anti-Injunction Act, the federal court may in these circumstances restrain subsequently filed state court proceedings involving the same subject matter. The prohibition of the Act is only against interference in a "pending" state proceeding. *Dombrowski v. Pfister*, 380 U.S. 479, 484 n. 2, 85 S.Ct. 1116, 1119 n. 2, 14 L.Ed.2d 22 (1965); *Barancik v. Investors Funding Corp.*, 489 F.2d 933, 936 and n. 8 (7th Cir.1973); *see also* J. Moore, 1A *Moore's Federal Practice*, ¶ 0.208c at 2353 (1982).

For reasons set forth by then Circuit Judge, now Justice Stevens, the question whether state actions are "pending" is appropriately answered by reference to the date on which injunctive relief is *sought* in federal court, not the date on which injunctive relief is *granted*. *Barancik v. Investors Funding Corp.*, 489 F.2d at 936–37 (parties seeking to litigate an issue in state court may not obtain the benefit of the Anti-Injunction Act by commencing state proceedings while a motion to enjoin such action is pending in the federal court; if the Act were applied in these circumstances, the would-be state court litigation would have an absolute right to defeat a well-founded motion by taking the very act the federal court was being urged to enjoin); *cf. Roth v. Bank of the Commonwealth*, 583 F.2d 527 (6th Cir.1978), *cert. denied*, 442 U.S. 925, 99 S.Ct. 2852, 61 L.Ed.2d 292 (1979).

*Id.* at 1127 [footnote omitted].

■ The complaint seeking injunctive relief against the enforcement of H.B. No. 117 was filed in this Court on May 30, 1985. Even though the case in the St. Louis County Circuit Court had been pending since May 16, 1985, it was not until May 31, 1985, the day after the instant case was filed, that TWA amended its petition seeking to enforce H.B. No. 117. The same day the Secretary of State was permitted to

intervene to secure compliance by Icahn with H.B. No. 117.

Although defendants concede that the instant case was filed before they sought to enforce H.B. No. 117 in state court, TWA argues that the filing of its amended petition in the St. Louis County case relates back to the filing of the original petition on May 16, 1985. Whether the May 31, 1985, amendment seeking to enforce H.B. No. 117 relates back should be determined by applying Missouri law. Rule 55.33(c), Missouri Rules of Civil Procedure, provides that "whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading."

On May 30, 1985, when H.B. No. 117 became law, the claims TWA was asserting against Icahn and others in state court were based on allegedly wrongful acts in the purchase of TWA shares. House Bill No. 117 does not require that a wrongful act occur before a control share acquisition is subject to regulation. Therefore, the claim for enforcement of H.B. No. 117 added on May 31, 1985, did not arise out of the allegedly wrongful acts alleged in TWA's First Amended Petition in state court.

Even if one assumes that the similar conduct, transactions or occurrences requirement of Rule 55.33(c) were met, the relation back doctrine does not apply. Rule 55.33 was intended to afford relief from the mechanical application of the statute of limitations where a party has notice of the subsequently asserted claims because they arise out of conduct already before the Court. *Hawkins v. Hawkins*, 533 S.W.2d 634, 638 (Mo.App.1976).

Here, no statute of limitations defense is or can be asserted against TWA's effort to enforce H.B. No. 117. Therefore, TWA is not seeking to use the relation back doctrine for the purpose intended by Rule 55.-33(c). Its inapplicability in this situation is demonstrated by the ludicrous result of applying relation back to the facts of this case. If the relation back doctrine were

applied, TWA's claim under H.B. No. 117 would be deemed to have arisen on May 16, 1985, when the original H.B. No. 117 was a simple bill pertaining to the award of contracts to out-of-state contractors. No claim being asserted by TWA in state court as of May 16, 1985, could possibly have given notice to plaintiff of a potential claim under H.B. No. 117 when the Senate Committee Substitute was not even introduced until May 29, 1985.

Therefore, the relation back doctrine in Rule 55.33 is not available to alter the chronological facts—the instant case seeking injunctive relief against enforcement of H.B. No. 117 was filed *before* TWA made any claim to enforce H.B. No. 117 in the St. Louis County case. At the time injunctive relief was requested in this court, there was no "pending" state proceeding involving H.B. No. 117.

Even if the enforceability of H.B. No. 117 had been asserted in state court before it was here, plaintiff has alleged a claim under 42 U.S.C. § 1983.

> The continued existence and enforcement of, and any action taken by the defendants under, the Takeover Act or the Control Share Acquisition Statute will deprive plaintiff of the rights, privileges and immunities secured to him by the Commerce Clause and Supremacy Clause, the Contract Clause and the Fourteenth Amendment in the United States Constitution, and by the federal laws set forth in the Exchange Act. Such rights, privileges and immunities are being deprived by defendants under color of state law.

Plaintiff's First Amended Complaint (Count VI).

Section 1983 is an "expressly authorized" statutory exception to the Anti-Injunction Act's absolute prohibition against enjoining pending state court proceedings. *Mitchum v. Foster*, 407 U.S. 225, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972).

Even though TWA correctly argues that plaintiff does not have an implied cause of action under the Williams Act, (*Piper v. Chris-Craft Industries, Inc.*, 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977)), plaintiff alleges that H.B. No. 117 violates the Supremacy and Commerce Clauses. Certainly Missouri and its Secretary of State are acting under color of state law in seeking to enforce the provisions of H.B. No. 117. Furthermore, TWA was also acting under color of state law in attempting to enforce H.B. No.117 because TWA is specifically authorized by the act to do so.

> Private individual conduct may constitute action under color of state statute where the power possessed by an individual or entity is possessed only because the individual or entity is clothed with the authority of state law. *See Northrip v. Federal National Mortgage Ass'n*, 527 F.2d 23, 33 (6th Cir.1975) (federal); *Barrera v. Security Building & Investment Corp.*, 519 F.2d 1166, 1170 (5th Cir.1975) (federal). In addition, where a private individual or entity jointly engages with state officials in a challenged action, as Bendix is doing in fact, the private individual or entity is acting under the color of a state statute for purposes of section 1983. *Dennis v. Sparks*, 449 U.S. 24, 27–28 [101 S.Ct. 183, 186, 66 L.Ed.2d 185] (1980); *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 943, 102 S.Ct. 2744, 2757, 73 L.Ed.2d 482 (1982).

*Martin-Marietta Corp. v. Bendix Corp.*, 690 F.2d 558, 562–63 (6th Cir.1982).

Therefore, plaintiff has stated a claim for relief under § 1983 against all defendants.

### YOUNGER ABSTENTION

Defendants argue that this Court should abstain under *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), because state court proceedings involving vital state interests were pending when this Court entered its temporary restraining order.

Under *Younger* a federal court should not enjoin a state proceeding commenced after the filing of a federal case but prior to proceedings of substance on the merits in the federal suit. *Hicks v. Miranda*, 422 U.S. 332, 95 S.Ct. 2281, 45

L.Ed.2d 223 (1975). The *Younger* doctrine "is not jurisdictional in nature, but is an equitable doctrine based upon comity." *Hunt v. Roth,* 648 F.2d 1148, 1154 (8th Cir.1981), *judgment vacated on other grounds,* 455 U.S. 478, 102 S.Ct. 1181, 71 L.Ed.2d 353 (1982). *Younger* abstention involves deference by the federal court to the state court where overriding state policies are involved. The state and federal interests should be balanced. *Younger v. Harris,* 401 U.S. at 44, 91 S.Ct. at 750–51. Where the federal interests clearly outweigh the state interests, application of *Younger* abstention is inappropriate. *Empire, Inc. v. Ashcroft,* 524 F.Supp. 898, 901 (W.D.Mo.1981).

■ Here, the major issues involve the conflict between state law and the federal Constitution and federal securities laws. Whether H.B. No. 117 violates the Commerce Clause or whether under the Supremacy Clause H.B. No. 117 has been preempted by federal law are questions primarily of federal, not state, policy. The Supreme Court has recognized that "federal courts are particularly appropriate bodies for the application of pre-emption principles." *Hagans v. Lavine,* 415 U.S. 528, 550, 94 S.Ct. 1372, 1386, 39 L.Ed.2d 577 (1974) (quoting *United Mine Workers v. Gibbs,* 383 U.S. 715, 729, 86 S.Ct. 1130, 1140, 16 L.Ed.2d 218 (1966)). Although Missouri asserts that important economic interests are protected by H.B. No. 117, those interests do not override the strong federal policies expressed in the Commerce and Supremacy Clauses.

■ Furthermore, *Younger* abstention is not appropriate unless plaintiff would be afforded an opportunity to present his federal claims in state court. In *National City Lines,* the state and federal courts had issued conflicting temporary restraining orders with regard to Missouri's Insurance Act. Thereafter, the state court expressly abstained from considering National's constitutional challenges to the Insurance Act. "Therefore, National had no opportunity in the state court proceedings to raise its constitutional challenges and, un-

der such circumstances, abstention is inappropriate. *See Gibson v. Berryhill,* 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973)." *National City Lines,* 687 F.2d at 1127.

Here, the judge in the state case stated in his June 7, 1985, Order that he was deferring consideration of H.B. No. 117 because the instant case was pending. As in *National City Lines,* abstention is inappropriate under these circumstances.

## PULLMAN ABSTENTION

Defendants argue that under the doctrine of *Railroad Comm'n. of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), this Court should abstain from deciding Icahn's motion for injunctive relief.

In *Martin-Marietta,* 690 F.2d at 563, the Court described *Pullman* abstention as follows:

> Under the *Pullman* doctrine, where a state law is being challenged in federal court as contrary to the federal Constitution and there are questions of state law which may be dispositive of the case, a federal court should abstain from deciding the case and allow the state courts to decide the state issues. *Pullman* abstention is appropriate in a case where the challenged state statute is susceptible of a construction by the state judiciary that would avoid or modify the necessity of reaching the federal constitutional question. *Babbitt v. United Farm Workers,* 442 U.S. 289, 306, 99 S.Ct. 2301, 2312, 60 L.Ed.2d 895 (1979), citing *Kusper v. Pontikes,* 414 U.S. 51, 54, 94 S.Ct. 303, 306, 38 L.Ed.2d 260 (1973). *Pullman* abstention is not appropriate, however, where it is clear that the statute is unconstitutional no matter how it may be construed by the state courts. *See Kusper, supra; Wisconsin v. Constantineau,* 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971).

In *National City Lines,* the Court rejected appellant's argument that the district

court should have abstained from deciding National's motion for injunctive relief.

> *Pullman* abstention presupposes two conditions: (1) there must be an unsettled issue of state law, and (2) there must be a possibility that the state law determination will moot the federal constitutional question raised. *See Kennecott Corp. v. Smith,* 637 F.2d 181, 184 (3d Cir.1980); *Coley v. Clinton,* 635 F.2d 1364, 1373 (8th Cir.1980). Neither condition exists here. The challenged provisions of the state acts are clear on their face and not susceptible of being construed in a way that would render it unnecesary to examine their impact on the purposes of the Williams Act.... Therefore, the present case does not involve an ambiguous or unsettled question of law, and for that reason *Pullman* does not apply to this case. *See Kenne-.cott Corp. v. Smith,* 637 F.2d 181.

*National City Lines,* 687 F.2d at 1126.

■ Similarly in the instant case, H.B. No. 117 is clear and unambiguous; it is not susceptible to a construction that renders it unnecessary to examine its impact on interstate commerce and on the regulatory scheme embodied in the Williams Act. Therefore, abstention is not appropriate.

### PENDANT JURISDICTION

Plaintiff alleges that this Court has jurisdiction to determine the validity of H.B. No. 117 under the Missouri Constitution pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1343 (jurisdiction over civil rights claims). Neither statute authorizes this Court to exercise jurisdiction over state claims. Therefore, this Court has jurisdiction to entertain Icahn's claims that H.B. No. 117 is invalid under the Missouri Constitution only if the exercise of pendant jurisdiction is appropriate under the circumstances of this case.

■ Pendant jurisdiction should be exercised only when a) the Court has the "power" to hear the claim and b) it is appropriate, under the circumstances of the case, for the Court to exercise its discretion to consider the pendant claims.

> Pendent jurisdiction, in the sense of judicial *power,* exists whenever there is a claim "arising under [the] Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority * * *," U.S. Const., Art. III, § 2, and the relationship between that claim and the state claim permits the conclusion that the entire action before the court comprises but one constitutional "case." The federal claim must have substance sufficient to confer subject matter jurisdiction on the court. *Levering & Garrigues Co. v. Morrin,* 289 U.S. 103, 53 S.Ct. 549, 77 L.Ed.2d 1062 [ (1933) ]. The state and federal claims must derive from a common nucleus of operative fact. But if, considered without regard to their federal or state character, a plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding, then, assuming substantiality of the federal issues, there is *power* in federal courts to hear the whole.

*United Mine Workers of America v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966) [emphasis in original], [footnote omitted].

■ Here, it could be argued persuasively that the state and federal challenges to the validity of H.B. No. 117 derive from a common nucleus of operative fact, i.e., the validity of H.B. No. 117. On the other hand, the state law challenges to the constitutionality of H.B. No. 117 are based on asserted violations of the legislative process established by the Missouri Constitution. The federal law challenges to H.B. No. 117 are based on the asserted conflict between substantive provisions of the statute and of the United States Constitution. Therefore, the legislative process is not challenged on federal constitutional grounds. Under this analysis, all claims may relate to the validity of H.B. No. 117 but the operative facts are quite different.

Without deciding whether this Court has the power to entertain Icahn's state constitutional claims, but assuming that it does,

the exercise of pendant jurisdiction under the circumstances of this case is not appropriate.

It has consistently been recognized that pendent jurisdiction is a doctrine of discretion, not of plaintiff's right. Its justification lies in considerations of judicial economy, convenience and fairness to litigants; if these are not present a federal court should hesitate to exercise jurisdiction over state claims.... *Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties by procuring for them a sure-footed reading of applicable law....*

*Gibbs*, 383 U.S. at 726, 86 S.Ct. at 1139 [emphasis added] [footnotes omitted].

Here, a decision on plaintiff's state constitutional claims is needless. The relief requested by plaintiff is granted under federal constitutional challenges to H.B. No. 117. Furthermore, the need to decide this case promptly militates against deciding the state law issues.

## COMMERCE CLAUSE

■■■ The Commerce Clause of the United States Constitution, art. I, § 8, cl. 3, provides that "Congress shall have Power ... [t]o regulate Commerce ... among the several States." The Commerce Clause is a limitation on the power of the states. *Great Atlantic & Pacific Tea Co., Inc. v. Cottrell*, 424 U.S. 366, 370–71, 96 S.Ct. 923, 927, 47 L.Ed.2d 55 (1976).

*Section 351.575 (H.B. No. 117) Violates the Commerce Clause Because It Directly Burdens Interstate Commerce*

■■■ Not every exercise of state power with some impact on interstate commerce is invalid. *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970). Although the Commerce Clause permits incidental regulation of interstate commerce by states, direct regulation of interstate commerce is prohibited. *Edgar v. MITE Corp.*, 457 U.S. 624, 640–43, 102 S.Ct. 2629, 2639–41, 73 L.Ed.2d 269 (1982) (plurality opinion);

*Southern Pacific Co. v. State of Arizona*, 325 U.S. 761, 775, 65 S.Ct. 1515, 1523, 89 L.Ed. 1915 (1945); *Shafer v. Farmers' Grain Co. of Embden*, 268 U.S. 189, 199, 45 S.Ct. 481, 485, 69 L.Ed. 909 (1925) "[A] state statute which by its necessary operation directly interferes with or burdens [interstate] commerce is a prohibited regulation and invalid, regardless of the purpose with which it was enacted." *Shafer*, 268 U.S. at 199, 45 S.Ct. at 485.

In *MITE*, 457 U.S. at 642–43, 102 S.Ct. at 2641, four justices agreed that:

The Commerce Clause also precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State. In *Southern Pacific Co. v. Arizona*, 325 U.S. 761, 775, 65 S.Ct. 1515, 1523, 89 L.Ed. 1915 (1945), the Court struck down on Commerce Clause grounds a state law where the "practical effect of such regulation is to control [conduct] beyond the boundaries of the state...." The limits on a State's power to enact substantive legislation are similar to the limits on the jurisdiction of state courts. In either case, "any attempt 'directly' to assert extraterritorial jurisdiction over persons or property would offend sister States and exceed the inherent limits of the State's power." *Shaffer v. Heitner*, 433 U.S. 186, 197, 97 S.Ct. 2569, 2576, 53 L.Ed.2d 683 (1977).

Applying these principles to the Illinois Business Take-Over Act, a plurality of the Supreme Court concluded that the act was an unconstitutional attempt to regulate interstate commerce directly.

Indeed, the Illinois law on its face would apply even if not a single one of Chicago Rivet's shareholders were a resident of Illinois, since the Act applies to every tender offer for a corporation meeting two of the following conditions: the corporation has its principal executive office in Illinois, is organized under Illinois laws, or has at least 10% of its stated capital and paid-in surplus represented in Illinois. Ill.Rev.Stat., ch. 121½, ¶ 137.52–

10(2) (1979). Thus the Act could be applied to regulate a tender offer which would not affect a single Illinois shareholder.

It is therefore apparent that the Illinois statute is a direct restraint on interstate commerce and that it has a sweeping extraterritorial effect. Furthermore, if Illinois may impose such regulations, so may other States; and interstate commerce in securities transactions generated by tender offers would be thoroughly stifled....

Because the Illinois Act purports to regulate directly and to interdict interstate commerce, including commerce wholly outside the State, it must be held invalid as were the laws at issue in *Shaffer [sic] v. Farmers Grain Co.* and *Southern Pacific.*

*Id.* at 642–43, 102 S.Ct. at 2640–41 (plurality opinion).

■ The regulatory scheme in Missouri's Control Share Acquisition Statute made applicable to foreign corporations by H.B. No. 117 directly burdens interstate commerce and attempts to control conduct beyond the borders of Missouri. Transactions between a non-Missouri purchaser and a non-Missouri seller of the shares of a non-Missouri corporation are directly regulated. As applied to foreign corporations, Missouri's Control Share Acquisition Statute would apply to every control share acquisition whether by open market purchase or tender offer. All purchases by a person proposing to make a control share acquisition would be halted until a super-majority of the shareholders approved Similarly, all shareholders would be prevented from selling their shares to the person proposing to make a control share acquisition until the super-majority approved (if it ever did).

Missouri's attempt to assert extraterritorial jurisdiction over nonresident persons and property is well illustrated by the facts of this case. Icahn, a resident of New York, seeks to gain control of TWA, which is incorporated in Delaware, by means of purchasing the common stock of TWA on the New York Stock Exchange. Under the provisions of H.B. No. 117, Icahn would be prohibited from purchasing shares from non-Missouri sellers until a super-majority of all shareholders approve. Similarly, all TWA shareholders regardless of where they live would be prevented from selling their shares to Icahn. If Missouri can so directly affect securities trading between non-residents on national exchanges, so too may other states. The interstate sale of securities on national and regional securities exchanges would be at the mercy of any state's parochial interests. Therefore, regardless of the local purposes prompting its enactment § 351.575 (H.B. No. 117) is an unconstitutional attempt to assert directly extraterritorial jurisdiction over persons and property.

TWA argues that § 28(a) of the Securities Exchange Act, 15 U.S.C. § 78bb(a), specifically authorizes state regulations similar to H.B. No. 117. Section 28(a) was designed to save state blue-sky laws from preemption. *Leroy v. Great Western United Corp.*, 443 U.S. 173, 182 n. 13, 99 S.Ct. 2710, 61 L.Ed.2d 464 (1979). States have traditionally regulated *intrastate* securities transactions. Blue-sky laws have withstood Commerce Clause challenges because they regulate only those transactions occurring within a state.

The provisions of the law ... apply to dispositions of securities *within* the state and while information of those issued in other states and foreign countries is required to be filed ..., they are only affected by the requirement of a license of one who deals with them *within* the State.... Such regulations affect interstate commerce in [securities] only incidentally.

*Hall v. Geiger-Jones Co.*, 242 U.S. 539, 557–58, 37 S.Ct. 217, 223, 61 L.Ed. 480 (1917).

Missouri's control share acquisition procedures differ substantially from state blue-sky laws in that they directly burden transactions taking place wholly outside the State of Missouri. See *MITE*, 457 U.S. at 641, 102 S.Ct. at 2640 (plurality opinion).

Defendants argue that *Cardiff Acquisitions, Inc. v. Hatch,* 751 F.2d 906 (8th Cir.1984) supports their contention that H.B. No. 117 does not violate the Commerce Clause. In *Cardiff,* the Court concluded that the Minnesota Take-Over Act burdened interstate commerce only indirectly. The Minnesota Act was a disclosure statute designed to protect Minnesota shareholders. The act was triggered only when the target company had a substantial number of Minnesota shareholders. Most importantly, any suspension in a take-over bid applied only to Minnesota shareholders. Therefore, the burden on interstate commerce was tailored narrowly to protect Minnesota investors. The Minnesota Act imposed none of the direct burdens on interstate transactions between non-residents that are inherent in the Missouri regulatory scheme.

*Mo.Rev.Stat. § 351.575 H.B. No. 117 Violates the Commerce Clause Because It Burdens Interstate Commerce and the Burden On Interstate Commerce Outweighs the Local Interests It Serves*

Even if the *Bruce Church* balancing test is applied, § 351.575 (H.B. No. 117) is unconstitutional because the burden imposed on interstate commerce is excessive in relation to the local interests served by the statute. *Pike v. Bruce Church, Inc.,* 397 U.S. at 142, 90 S.Ct. at 847.[10]

1. Burden imposed on
interstate commerce.

The most obvious burden § 351.575 (H.B. No. 117) imposes on interstate commerce arises from the regulatory scheme's nationwide reach in delaying and maybe prohibiting purchases of the stock of a foreign corporation. The effects of allowing Missouri to halt purchases and sales by non-residents of Missouri of a foreign corporation's stock on a national securities exchange are substantial.

Shareholders are deprived of the opportunity to sell their shares at a premium. The reallocation of economic resources to their highest valued use, a process which can improve efficiency and competition, is hindered. The incentive the tender offer mechanism provides incumbent management to perform well so that stock prices remain high is reduced. See Easterbrook & Fischel, The Proper Role of a Target's Management in Responding to a Tender Offer, 94 Harv.L.Rev. 1161, 1173–74 (1981); Fischel, Efficient Capital Market Theory, the Market for Corporate Control, and the Regulation of Cash Tender Offers, 57 Texas L.Rev. 1, 5, 27–28, 45 (1978); H.R.Rep. No. 94–1373, p. 12 (1976).

*MITE,* 457 U.S. at 644, 102 S.Ct. at 2641.

Although these comments were made with reference to a tender offer, the benefits to the economy, the target corporation and its shareholders from an acquisition are substantial whether by tender offer or open market purchase.

The available evidence however, is that mergers and acquisitions increase national wealth. They improve efficiency, transfer scarce resources to higher valued uses, and stimulate effective corporate management. They also help recapitalize firms so that their financial structures are more in line with prevailing market conditions. In addition, there is no evidence that mergers and acquisitions have, on any systematic basis, caused anticompetitive price increases.

* * * * *

To the extent that government regulations impose costs on bidders, or reduce a bidder's chances for success, fewer take-over attempts will be made. This tends to insulate corporate managements from the competitive pressures of the external market for corporate control. Stockholders, as a group, will also suffer as a result of excessive regulation because it

---

**10.** In applying the *Bruce Church* test, this Court should consider "the weight and nature of the state regulatory concern in light of the extent of the burden imposed on the course of interstate commerce." *Raymond Motor Transportation, Inc. v. Rice,* 434 U.S. 429, 441, 98 S.Ct. 787, 794, 54 L.Ed.2d 664 (1978).

reduces the chance to earn takeover premiums.

"The Market for Corporate Control," February, 1985, *Economic Report of the President together with the annual report of the Council of Economic Advisers*, at 196 and 191.

### 2. The asserted state interests.

The state interests that the defendants suggest H.B. No. 117 was intended to further are 1) the economic well-being of the State of Missouri; 2) air transportation for Missourians; and 3) the solvency of Missouri political subdivisions. Additionally, the state argues that H.B. No. 117 is intended to protect Missouri shareholders.

Protecting Missouri shareholders certainly is a legitimate state objective. However, H.B. No. 117 does not limit its impact to Missouri shareholders. There is no requirement in H.B. No. 117 that the issuing corporation have a single shareholder who is a Missouri resident. Missouri has no legitimate interest in protecting nonresident shareholders. *MITE*, 457 U.S. at 644, 102 S.Ct. at 2641. Therefore, "there is nothing to be weighed in the balance to sustain the law." *Id.*

If protection of Missouri economic interests had been the legislative purpose, the legislative scheme should protect those interests. On its face, H.B. No. 117 does nothing to protect the economic interests asserted by defendants. There is no mechanism in H.B. No. 117 to assure that a foreign corporation such as TWA will continue to maintain any level of Missouri employment or for that matter any presence in Missouri. Furthermore, management approved control share acquisitions are exempted from regulation without regard to the effect that the acquisiton would have on Missouri's economic interests.

Defendants argue that Missouri sought to protect its economic interests by favoring incumbent management. According to defendants, the legislature assumed that current management was committed to Missouri. Therefore, the general assembly sought to protect this assumed "symbiotic" relationship by imposing hurdles in the path of a non-management approved purchaser.

It is difficult to discern the rational basis for concluding that incumbent management will protect the economic interests of Missouri if there is a conflict with management's interests,[11] or with the economic interests of the corporation. TWA concedes that management can change its plans about the level of commitment to Missouri as the result of a change in its assessment of the economics of the air transportation business. In fact, TWA already has demonstrated that it will abandon Missouri if believed advisable because it moved its headquarters from Kansas City to New York. Furthermore, TWA recently has reduced the number of departures from Kansas City at the same time it was increasing departures from St. Louis. In the future, Missouri might not be the beneficiary of TWA's decisions. On the other hand, TWA witnesses testified that they are cognizant of an obligation to the State of Missouri and particularly to the political subdivisions that have helped finance airport and other facilities for TWA's use.

Furthermore, in weighing the state's interest against the burden on interstate commerce, the weight accorded the state's interest must be reduced because the Missouri legislature attempted to protect its economic interest by favoring incumbent management. Seeking to further economic interests in that way conflicts with the Williams Act's policy of neutrality between offerors and management. *MITE*, 457 U.S. at 633, 102 S.Ct. at 2636. Therefore, Missouri's attempt to regulate control share acquisitions of foreign corporations is invalid under the Commerce Clause because it furthers the purpose of protecting Mis-

---

**11.** The Vice-President of Scheduling and Pricing for TWA testified that there was a substantial severance plan for upper level management which would become effective when 1) a certain percentage of TWA shares was acquired; and 2) the Board of Directors determined that an unfriendly acquisition of TWA was imminent. The first requirement had been satisfied.

souri's economic interests so marginally and interferes so substantially with interstate commerce.

## SUPREMACY CLAUSE

Article VI, cl. 2, of the United States Constitution provides: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof ... shall be the supreme Law of the Land ...; any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

 The Supremacy Clause invalidates state laws that "interfere with, or are contrary to" federal law. *Gibbons v. Ogden*, 9 Wheat. 1, 211, 6 L.Ed. 23 (1824). Federal law may supersede state law in several ways: (1) when Congress constitutionally can and does do so in express terms; (2) when Congress' intent to preempt state law may be inferred from a comprehensive scheme of federal regulation; and (3) when state law conflicts with federal law.

> Such a conflict arises when "compliance with both federal and state regulations is a physical impossibility," *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–143 [83 S.Ct. 1210, 1217, 10 L.Ed.2d 248] (1963), or when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz, supra* [312 U.S. 52], at 67 [61 S.Ct. 399, 404, 85 L.Ed. 581]. See generally *Capital Cities Cable, Inc. v. Crisp*, 467 U.S. [——, ——, 104 S.Ct. 2694, 2700, 81 L.Ed.2d 580] (1984).

*Hillsborough County v. Automated Medical Laboratories, Inc.,* —— U.S. ——, ——, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714 (1985).

### 1. *Federal Statutory Scheme*

In 1968 Congress passed the Williams Act which amended the Securities Exchange Act of 1934. Section 13 of the Securities Exchange Act of 1934, as amended by the Williams Act, requires that certain disclosures be made by a purchaser of more than five percent of a security reg-

istered under § 13 of the Securities Exchange Act. 15 U.S.C. § 78m(d)(1). The purchaser must disclose:

> 1) information about the purchaser;
>
> 2) the sources and amounts of the consideration used in the purchases;
>
> 3) if the purpose is to acquire control, the purchaser must disclose information about plans to liquidate, sell assets, merge, or make other changes in the corporate structure;
>
> 4) the number of shares that the purchaser beneficially owns and has a right to acquire; and
>
> 5) the existence of any contracts relating to securities of the target corporation.

The Williams Act provides no further regulation of open market purchases.

In the Williams Act amendments to § 14 pertaining to tender offers, Congress required additional disclosures to the Securities Exchange Commission, the target company and its shareholders, established a timetable for the tender offer and provided mandatory terms for the tender offer, e.g., all shares tendered must be purchased for the same price.

### 2. *Federal Policy*

The Williams Act "was the congressional response to the increased use of cash tender offers in corporate acquisitions, a device that had 'removed a substantial number of corporate control contests from the reach of existing disclosure requirements of the federal securities laws.' *Piper v. Chris-Craft Industries, Inc.*, 430 U.S. 1, 22 [97 S.Ct. 926, 939, 51 L.Ed.2d 124 (1977)." *Mite*, 457 U.S. at 632, 102 S.Ct. at 2635. Congress intended to protect shareholders by requiring the disclosure of pertinent information when persons attempted to obtain control of a corporation by cash tender offer or by open market purchases of securities. *Piper*, 430 U.S. at 26–35, 97 S.Ct. at 941–46. "The function of federal regulation is to get information to the investor by allowing both the offeror and the incumbent managers of a target company to present fully their arguments and then

to let the investor decide for himself." *Great Western United Corp. v. Kidwell*, 577 F.2d 1256, 1276 (5th Cir.1978), *rev'd on venue grounds sub nom. Leroy v. Great Western United Corp.*, 443 U.S. 173, 99 S.Ct. 2710, 61 L.Ed.2d 464 (1979).

Neutrality in contests for control was an important characteristic of the legislative approach adopted in the Williams Act. Congress intended to withhold from management or the purchaser any undue advantage that could frustrate the investor's exercise of an informed choice.

But it is also crystal clear that a major aspect of the effort to protect the investor was to avoid favoring either management or the takeover bidder. As we noted in *Piper*, the disclosure provisions originally embodied in S. 2731 "were avowedly pro-management in the target company's efforts to defeat takeover bids." 430 U.S., at 30, 97 S.Ct., at 943. But Congress became convinced "that takeover bids should not be discouraged because they serve a useful purpose in providing a check on entrenched but inefficient management." Senate Report, at 3. It also became apparent that entrenched management was often successful in defeating takeover attempts. As the legislation evolved, therefore, Congress disclaimed any "intention to provide a weapon for management to discourage takeover bids," *Rondeau v. Mosinee Paper Corp., supra*, 422 U.S. [49] at 58, 95 S.Ct. [2069] at 2075 [45 L.Ed.2d 12 (1975) ], and expressly embraced a policy of neutrality. As Senator Williams explained: "We have taken extreme care to avoid tipping the scales either in favor of management or in favor of the person making the takeover bids." 113 Cong. Rec. 24664 (1967). This policy of "evenhandedness," *Piper v. Chris-Craft Industries, Inc., supra*, 430 U.S., at 31, 97 S.Ct., at 944, represented a conviction that neither side in the contest should be extended additional advantages vis-a-vis the investor, who if furnished with adequate information would be in a position to make his own informed choice.

*MITE*, 456 U.S. at 633, 102 S.Ct. at 2636 [footnote omitted]; *see also Piper*, 430 U.S. at 29–30, 97 S.Ct. at 943–44.

Nothing in the Williams Act expressly or impliedly bars States from regulating tender offers or open market stock transactions. *National City Lines*, 687 F.2d at 1129. Furthermore, Missouri's regulation of control share acquisitions does not directly conflict with the disclosure provisions of § 13 relating to open market transactions. However, Missouri's control share acquisition regulations do conflict directly with the disclosure and timetable requirements for a tender offer in § 14 of the Williams Act. A person seeking a control share acquisition by means of a tender offer must first announce his offer and submit it to the target company. Mo.Rev. Stat. § 351.407.2. The offeror can commence an offer directly to the shareholders only after receiving the approval of a super-majority of the shareholders. Mo.Rev. Stat. § 351.407.3. It is unlikely that such a vote could be completed within the five days allowed by the Williams Act to commence a tender offer after it has been announced. 17 C.F.R. § 240.14d–2. Furthermore, the tender offeror would be prevented from commencing to purchase shares on either the sixteenth or twenty-first business day after the commencement of the offer because the shareholder vote required by the Missouri law would not have taken place. 17 C.F.R. §§ 240.14d–7, 240.14d–8, 240.14e–1(a). Finally, the tender offeror would be prohibited from purchasing shares within the deadlines set by the Williams Act if he could not obtain shareholder approval. State timetables for and obstacles to tender offers that conflict with the Williams Act have been declared invalid. *National City Lines*, 687 F.2d 1122; *Empire, Inc.*, 524 F.Supp. 898.

■ In its attempted regulation of control share acquisition by means of open market purchases, the Missouri regulatory scheme stands as an obstacle to the accomplishment of Congress' objectives in adopting the Williams Act. Under § 13 of the Williams Act, as implemented by Securities

Exchange Commission regulation (17 C.F.R. § 240), a person who has purchased five percent of a registered security, must file a Schedule 13D making the required disclosures. However, the purchaser may continue to purchase shares on the open market both before and after filing the Schedule 13D. Section 13 of the Williams Act and the implementing regulations do not limit the number of shares that can be acquired by means of open market purchases or establish any timetable for acquiring shares. Furthermore, a shareholder in the target company was to be left free to make an informed choice whether to sell and obtain the benefit, if any, of the demand for the shares created by the purchaser.

Missouri's control share acquisition procedures interfere directly with the § 13 approach by preventing a person seeking a control share acquisition from buying shares on the open market until shareholder approval has been obtained. Also, whether a shareholder would ever be able to sell into a market influenced by the presence of the purchaser would not depend on the investor's informed decision, but on the decision of a super-majority of all shareholders of the target company. Thus, deciding whether to buy or to sell would be taken out of the hands of the shareholder and the purchaser and placed in the hands of management and other shareholders.

In addition, the Missouri regulatory scheme upsets Congress' efforts to protect the investor without favoring either the purchaser or incumbent management. Missouri's legislative approach is to favor incumbent management. For instance, (1) Missouri's Control Share Acquisition Statute does not apply to a qualifying foreign corporation if the control share acquisition is approved by a majority (not a super-majority) of the directors (not the shareholders) of the corporation in office before the first control share acquisition is made (ap-

parently thereby excluding from the vote any directors whose election might be the result of the purchaser's votes) (Mo.Rev. Stat. § 351.575.5 (H.B. No. 117)); (2) incumbent management sets the date for the shareholder vote within a statutorily established range up to fifty days after the purchaser requests the vote (Mo.Rev.Stat. § 351.407.3); (3) notice to shareholders of the meeting to vote on the proposed purchase shall be accompanied by a statement by management (Mo.Rev.Stat. § 351.407.5); and (4) the proposed control share acquisition cannot be made unless it is approved by two-thirds of the outstanding shares AND two-thirds of the outstanding shares interested shares. (Mo.Rev.Stat. § 351.-407.5.) By requiring two-thirds approval of all outstanding shares, all votes not cast operate as votes against the purchaser. *Id.*

For the reasons stated above, Missouri's attempt to make its control share acquisition regulations applicable to foreign corporations is invalid under the Supremacy Clause because it stands as an obstacle to the accomplishment of the full purposes of Congress in adopting the Williams Act.[12]

### RELIEF

Plaintiff has requested both injunctive and declaratory relief against Missouri's control share acquisition procedures. Relying on plaintiff's Amendment No. 8 to his Schedule 13D, defendants argue that no injunctive relief should be granted because plaintiff is no longer seeking to acquire more TWA shares. Furthermore, defendants assert that any declaratory relief should not reach any effect the Missouri procedures might have on tender offers because plaintiff has never made a tender offer to TWA's shareholders.

As was stated in the discussion about mootness, Missouri's attempt to regulate control share acquisitions of qualifying for-

12. Because of the expedited processing of this case (approximately three weeks elapsed from the filing of plaintiff's complaint to the issuance of this Order), the parties have concentrated their efforts on the jurisdiction, abstention, Commerce Clause and Supremacy Clause issues. Because of the need for a prompt ruling on the merits and because of the decision reached, the Court will not delay issuance of this Order to rule the remaining federal issues.

eign corporations is a continuing and brooding presence casting its shadow over plaintiff. On May 23, 1985, plaintiff told the Securities Exchange Commission that he intended to acquire additional TWA shares in the open market or through a tender offer. On June 17, 1985, plaintiff again stated that he intended to explore making further open market purchases or making a counter-bid to the Texas Air proposal. Plaintiff should not have to weigh the threat presented by Missouri's control share acquisition procedure in deciding what action is necessary to protect the value of his substantial investment in TWA.

For the reasons stated above, it is hereby ORDERED that pursuant to 42 U.S.C. § 1983 and the Declaratory Judgment Act, 28 U.S.C. § 2201 (1984):

1) the challenges to Senate Committee Substitute for H.B. No. 117 based on violations of the Missouri Constitution are dismissed without prejudice because the Court declines to exercise pendant jurisdiction over them;

2) Sections 351.575.1 through 351.575.5 of Senate Committee Substitute for H.B. No. 117 violate the Supremacy Clause of the United States Constitution, article VI, clause 2, because they stand as an obstacle to the accomplishment of the full purposes of Congress in adopting the Williams Act;

3) Sections 351.575.1 through 351.575.5 of Senate Committee Substitute for H.B. No. 117 violate the Commerce Clause of the United States Constitution, article I, section 8, clause 3, because they directly burden interstate commerce and because the burden on interstate commerce outweighs the state regulatory concern;

4) defendants Roy Blunt, the Missouri Secretary of State, The State of Missouri, and Trans World Airlines, Inc., their officers, agents, servants, successors in office, employees, directors, attorneys, and all persons in active concert or participation with any defendant, who receive actual notice of this Order by personal service or otherwise are permanently restrained, prohibited and enjoined from enforcing or attempting to

enforce Mo.Rev.Stat. § 351.575.1 through 351.575.5 (Senate Committee Substitute for H.B. No. 117), Mo.Rev.Stat. § 351.407 or Mo.Rev.Stat., Chapter 409, against any person proposing to make a control share acquisition, as that term is defined in Mo.Rev. Stat. § 351.015(6), in a corporation not incorporated under the laws of Missouri.

5) if plaintiff desires to pursue his request for an award of attorney's fees under 42 U.S.C. § 1988, he shall file an appropriate motion within ten days from the date of this Order; and

6) the costs of this action are assessed against defendants.