DYNAMICS CORPORATION OF
AMERICA, Plaintiff,

v.

CTS CORPORATION, Robert D. Hostet-
ler, Gary B. Erekson, Joseph DiGirola-
mo, George F. Sommer, Gerald H.
Frieling, Jr., Don J. Kacek, Ted Ross,
and Richard M. Ringoen, Defendants.

No. 86 C 1624.

United States District Court,
N.D. Illinois, E.D.

April 9, 1986.

On Motion to Certify Opinion for
Immediate Appeal April 16, 1986.

Lowell Sachnoff, Dean A. Dickie, Sarah R. Wolff, Jeffrey E. Stone, Michael J. Kaufman and Thomas J. Bamonte, Sachnoff, Weaver & Rubenstein, Ltd., Chicago, Ill., for plaintiff.

Stephen C. Sandels, Gary L. Prior, Mark L. Yeager, J. Craig Busey, William P. Schuman and David Marx, McDermott, Will & Emery, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

GETZENDANNER, District Judge:

This action for declaratory and injunctive relief was originally filed to enjoin alleged violations of Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a), and Rule 14(a) promulgated thereunder, for noncompliance with applicable SEC rules and misrepresentations in connection with the sending of proxy solicitations. Plaintiff Dynamics Corporation of America ("DCA") is a New York corporation with its principal place of business in Greenwich, Connecticut. Defendant CTS is an Indiana corporation with its principal place of business in Elkhart, Indiana. This court has jurisdiction over the matter pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and venue is proper because the defendants are found and transact business in this district.

DCA is the largest beneficial owner of common stock in CTS, owning approximately 9.7% of CTS' outstanding common stock. Individual defendants Robert D. Hostetler, Gary B. Erekson, Joseph DiGirolamo, George F. Sommer, Gerald H. Frieling, Jr., Don J. Kacek, Ted Ross, and Richard M. Ringoen are all members of the Board of Directors of CTS. Defendants Hostetler, Erekson, and DiGirolamo are also CTS officers. In the complaint, DCA accuses defendants of engaging in an ongoing plan to entrench themselves as current management through a series of "gun-jumping" proxy solicitations.

The same day it filed this action, DCA publicly announced its intention to make a partial tender offer for 1,000,000 CTS shares, which would give it approximately a 27.7% ownership position in CTS. DCA has indicated that it intends to use these shares to oust current management and elect its own candidates to CTS' Board of Directors at the Annual Meeting of CTS shareholders, scheduled for April 25, 1986.

DCA's tender offer predictably set off a series of defensive maneuvers by the CTS Board and a consequent expansion of the claims and controversies before this court. The sole issue before the court in this opinion is the constitutionality of the Indiana Control Shares Acquisitions Act, Indiana Code, 23–1–42 et seq., a statute which regulates the voting rights of shares acquired as a result of a tender offer or other share acquisition which results in an ownership position exceeding 20%. This statute is part of a series of amendments to the Indiana Business Corporation Law which were signed into law on March 4, 1986, and which are to become effective August 1, 1987. IND.CODE § 23–1–17–

3(a). Section 23–1–17–3(b) of the statute, however, permits those corporations which so elect by resolution of the board of directors to be governed by the statute as of April 1, 1986. IND.CODE § 23–1–17–3. On March 27, 1986, the CTS Board of Directors by resolution made the new Act applicable to tender offers for CTS shares as of April 1, 1986.

That same day, and before April 1, 1986, CTS filed a declaratory judgment action in Indiana state court to have the control share acquisition provisions in IND.CODE § 23–1–42 declared valid and enforceable. On March 31, 1986, DCA filed its third amended complaint to add a new Count (Count VIII) directed to the new Act and moved for injunctive relief restraining defendants from attempting to enforce the Act in Indiana state court. Defendants represented at a court hearing on April 2, 1986 before Emergency Judge Milton Shadur that they would not take any action in connection with the state court proceeding pending a ruling by this court on the statute's validity and that therefore there was nothing to enjoin. It became apparent in the course of argument, however, that on March 31, 1986, CTS issued press releases referring to the Board's adoption of the new statute and the statute's effect on DCA's ability to vote its shares. Because those releases were arguably affecting DCA's ability to make a tender offer, the matter was scheduled for expedited ruling on a declaratory judgment motion. 28 U.S.C. § 2201.

The basis of DCA's request is that the Indiana Control Shares Acquisition Act violates the Commerce Clause, Article 1, § 8, cl. 3, and the Supremacy Clause, Article 6, cl. 2, of the United States Constitution. In particular, DCA argues 1) that the Act directly burdens interstate commerce; 2) that the Act's indirect burden on interstate commerce outweighs any putative local benefits; and 3) that the Act's timing provisions and procedural hurdles conflict directly with the Williams Act by favoring management and building extended delay into the process of making tender offers. CTS, in response, argues that the Act is a permissible exercise of state legislation to govern the internal affairs of a corporation and the relative voting rights of shareholders in Indiana corporations. In order to understand the nature of these challenges, a full explication of the statute is necessary.

**Indiana Control Shares Acquisition Act**

Sections 23–1–42–1 through 23–1–42–11 of the new Indiana Business Corporation Law govern "Control Share Acquisitions," defined as the acquisition by a single entity of shares which give it more than 20 percent of the voting power with respect to shares of an "issuing public corporation." § 23–1–42–1. Shares acquired within a 90 day period are considered to have been acquired in a single transaction. § 23–1–42–2(b). The Act defines "issuing public corporation" as a corporation that has:

(1) one hundred (100) or more shareholders;

(2) its principal place of business, its principal office, or substantial assets within Indiana; and

(3) either:

(A) more than ten percent (10%) of its shareholders resident in Indiana;

(B) more than ten percent (10%) of its shares owned by Indiana residents; or

(C) ten thousand (10,000) shareholders resident in Indiana.

IND.CODE § 23–1–42–4(a). It is undisputed that CTS is an "issuing public corporation" within the meaning of the statute and that DCA's tender offer is a "control share acquisition" which triggers the Act's provisions.

Under the Act, shares acquired in a control share acquisition have voting rights *only* to the extent granted by resolution approved by the shareholders of the target corporation. In other words, the Act automatically strips the voting rights from such shares unless and until the shareholders resolve otherwise. In order for a tender offeror to regain the voting rights, the resolution must be approved by:

(1) each voting group entitled to vote separately on the proposal by a majority

of all the votes entitled to be cast by that voting group, ... *and*

(2) each voting group entitled to vote separately on the proposal by a majority of all the votes entitled to be cast by that group, excluding all interested shares. IND.CODE § 23-1-42-9(b) (emphasis added). "Interested shares" are defined as shares the voting of which is controlled by an acquiring person, any officer of the corporation, and any employee of the corporation who is also a director of the corporation. § 23-1-42-3.

An acquiror under the statute who seeks to avoid the above consequences may at its election deliver an "acquiring person statement" to the issuing public corporation setting forth certain specified information. § 23-1-42-6. If the acquiring person so requests at the time of delivery and undertakes to pay the corporation's expenses of a special meeting, the directors shall call a special meeting of shareholders for the purpose of considering the voting rights to be accorded the shares. If the offeror "so requests," the meeting "must not be held sooner than 30 days after receipt ... of the acquiring person statement" and the meeting can in any event be delayed up to 50 days after receipt. Otherwise, the voting rights to be accorded the control shares "shall be presented to the next special or annual meeting of shareholders." § 23-1-42-7(a)-(d).

If an acquiror fails to file an acquiring person statement, or if the shares are subsequently not accorded full voting rights, the corporation may, to the extent authorized by its bylaws or articles of incorporation, redeem the shares at their "fair value." If the shares are accorded full voting rights and the acquiring person has acquired a majority of all voting power, the shares may not be redeemed. Upon voter resolution approving the acquisition, the other shareholders have dissenters' rights which enable them to receive the fair value of their shares. "Fair value" as used in both subsections means "a value not less than the highest price paid per share by the acquiring person in the control share acquisition." § 23-1-42-11-(a)—(c).[1]

### Jurisdictional Issues

In its briefs filed before Emergency Judge Shadur opposing DCA's motions to amend its complaint and for preliminary relief regarding the Control Shares Acquisition Act, CTS argued that the anti-injunction act would bar DCA's request for relief; that this court lacks Article III jurisdiction for lack of ripeness; and that abstention under the doctrine of *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941) would be proper. Although Judge Shadur either expressly in open court or by clear implication ruled on these jurisdictional arguments when he granted DCA leave to amend its complaint, he also indicated at the hearing that CTS would be free to renew its arguments to me upon my return. Moreover, he entered no written ruling reflecting those determinations. In order to prevent any confusion on the record, the court deems it appropriate to address those issues in this opinion.

First is CTS's argument that the anti-injunction act would bar this court from enjoining the pending state court action. 28 U.S.C. § 2283. This argument is mooted for the moment at least by CTS's concession before Judge Shadur that it would take no action in the state court proceeding until this court ruled on the constitutionality of the Control Shares Acquisition Act. The anti-injunction act does not prevent this court from issuing a declaratory judgment or order requiring CTS to count at the April 25, 1986 shareholders' meeting shares that DCA had acquired in a "control share acquisition." Since DCA does not presently seek this court to enjoin the state court lawsuit, the court does not reach the

---

1. One further ramification of the statute is that, unless the CTS board presently approves DCA's acquisition of shares above 10%, CTS would be unable to engage in any business combination with DCA for a period of five years following DCA's acquisition through its tender. *See* IND. CODE § 23-1-43-18(a). The parties have not mentioned this provision and the court finds that in any event the validity of this provision is not presently ripe for adjudication.

issue and will respect the concurrent jurisdiction of the Indiana state court.

■ Second is CTS's argument that this court lacks jurisdiction under Article III to enter a judgment at this time that the control share provisions of the Indiana Business Corporation law are unconstitutional. First, CTS argues that DCA is not injured in fact, and that DCA has not established that injury through evidence. Second, CTS argues that the injury is in any event speculative since DCA has admitted that it would not pursue the tender offer if this court upholds CTS's "poison pill" shareholder rights plan, the validity of which is to be ruled on next week. Both of these arguments are misguided.

The Seventh Circuit has held that a "threat of enforcement of state law" is justiciable under Article III whenever the threat presents "immediate coercive consequences" or "immediate business costs." *Alcan Aluminum, Ltd. v. Department of Revenue*, 724 F.2d 1294, 1297 (7th Cir. 1984); *Nuclear Engineering Co. v. Scott*, 660 F.2d 241, 251–52 (7th Cir.1981), *cert. denied*, 455 U.S. 993, 102 S.Ct. 1622, 71 L.Ed.2d 855 (1982). In this case, DCA has shown such "immediate business costs." Under the Williams Act time-frame, DCA has the right to purchase CTS shares tendered to it on April 10, 1986. CTS, however, has unequivocally indicated that it will invoke state law to prevent those shares from being "voted" at the April 25, 1986 shareholders' meeting. That subsequent rulings of this court might cause DCA to withdraw its offer is beyond the point: CTS's threat of enforcing the Control Shares Act has generated uncertainty for DCA in the midst of a heated contest for corporate control. This uncertainty is not speculative nor anticipatory only, but a present fact.

CTS alternatively argues that this court should not address a constitutional issue until it decides other legal issues that may be dispositive and may avoid the need for constitutional adjudication. *Escambia County v. McMillian*, 466 U.S. 48, 51, 104 S.Ct. 1577, 1578, 80 L.Ed.2d 36 (1984).

This principle of jurisprudence, however, is generally invoked in the situation where a party seeks identical relief under both statutory and constitutional grounds. In the present case, DCA has requested under its state law claim in Count VI that CTS be enjoined from enforcing a shareholders rights' plan which would seriously dilute the value of the corporation should DCA acquire over 15%. Under the constitutional claim at issue here, DCA only requests that it be assured the right to vote the shares at the April 25 meeting. The relief requested under the two counts is entirely distinct. While DCA might withdraw its tender offer in response to other adverse rulings by this court, DCA is under no obligation to do so, and the issue is therefore not one which would be necessarily mooted by a subsequent adverse determination.

The rule adopted here is admittedly not appropriate for all cases. Congress has implicitly if not expressly determined, however, that delay is often a crucial management weapon in the context of a battle for corporate control. *Edgar v. MITE Corp.*, 457 U.S. 624, 637, 102 S.Ct. 2629, 2638, 73 L.Ed.2d 269 (1982). Moreover, the impending date of the shareholders' meeting and the pace of this litigation require this court, as far as is possible, to resolve non-factual matters in advance of any evidentiary hearings. To delay a ruling in this case would unfairly tip the balance of the parties' contest for control in CTS's favor.

Finally, even were this court inclined to await ruling based on potential mootness concerns, CTS has put the constitutionality of the Act squarely in issue by embracing the Act and publicly announcing that its effect is to strip DCA of voting power acquired along with the shares. CTS's decision to issue this press release reflects its belief that the information is "material" under the test of *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). Because statutes are presumed constitutional, this court's decision to enforce or invalidate the Act under the facts in this case is obviously a "material" issue of which the sharehold-

ers also have a right to know in advance of deciding whether or not to tender shares and/or proxies. As I noted in an earlier order denying DCA certain temporary relief, the "public interest is served if shareholders know exactly where they stand when deciding whether to tender their shares...." That principle will be best served in this case by a prompt ruling on the merits so as to minimize uncertainty.

CTS has argued that the uncertainty on the market is speculative and that DCA should not be entitled to redress shareholder injuries which it has not suffered and of which there is no evidence. This argument, reasonable in the abstract, nonetheless misses the point. By informing the public of the Indiana Control Shares Act and its effect on DCA's tender, CTS has injected arguably misleading information into the marketplace which this court has the power, if not the duty, to correct. While DCA has indeed argued that market uncertainty exists without presenting evidence to support that claim, this court has relied chiefly on the harm to DCA in its decision that immediate relief is appropriate. Moreover, the materiality test of *Northway* is an objective one, and needn't be satisfied in every case by actual evidence of market response. In this case, the court finds as a matter of law that the constitutionality of the Act is *material*, given CTS's March 31, 1986 press release, and that DCA needn't prove actual market reliance on the information to obtain relief.[2]

For similar reasons, the court rejects CTS's argument for abstention. To abstain would only delay the proceedings and compound the potential for confusion in the market. Moreover, CTS has not made the preliminary showing necessary for this court to decline the exercise of its jurisdiction. The abstention doctrine of *Railroad Commission of Texas v. Pull-*

*man Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1942) is intended to avoid "needless friction with state policies," *id.* 312 U.S. at 500, 61 S.Ct. at 645, and should be invoked only where the state statute is "fairly subject to an interpretation which will render or substantially modify the federal constitutional question." *Harman v. Forssenius*, 380 U.S. 528, 534–35, 85 S.Ct. 1177, 1181–82, 14 L.Ed.2d 50 (1965). Abstention is not proper merely to give a state court the opportunity to rule first. *Wisconsin v. Constantineau*, 400 U.S. 433, 438–39, 91 S.Ct. 507, 510–11, 27 L.Ed.2d 515 (1971). In this case, CTS has pointed to no ambiguity in the Indiana Control Shares Act the resolution of which would obviate the need for a constitutional ruling. Instead, CTS has simply suggested that an Indiana court "might" find the provisions of the statute unacceptable under the state or federal constitutions. Such vague suggestions are plainly insufficient to support a request for *Pullman* abstention.

### Section 2403(b) Certification

Title 28, section 2403(b) of the United States Judicial Code provides that in any action in a United States court

> to which a State or any agency, officer, or employee thereof is not a party, wherein the constitutionality of any statute of that State affecting the public interest is drawn in question, the court shall certify such fact to the attorney general of the State, and shall permit the State to intervene for presentation of evidence, if evidence is otherwise admissible in the case, and for argument on the question of constitutionality.

28 U.S.C. § 2403(b). Like its federal counterpart in § 2403(a), the requirement of notice and certification is not discretionary. *Merrill v. Town of Addison*, 763 F.2d 80, 82 (2d Cir.1985). The cases are divided

---

**2.** In its opposition brief filed before Judge Shadur, CTS argued that DCA would suffer no irreparable harm by being forced to await this court's decision on the shareholders' rights plan before receiving a ruling on the Control Act's constitutionality. Because DCA is not presently seeking an injunction, the issue needn't be resolved at this moment. The court notes, however, that CTS's argument on irreparable harm is identical with its argument that no Article III controversy exists, and is therefore unpersuasive in any event.

whether the obligation to certify rests with the court, *id.,* or with the party mounting the constitutional challenge. *Kealey Pharmacy & Home Care Services, Inc. v. Walgreen Co.,* 761 F.2d 345, 350 n. 8 (7th Cir.1985). The cases are uniform, however, in holding that a failure to certify does not deprive the district court of jurisdiction. *Merrill,* 763 F.2d at 83; *Kealey Pharmacy,* 761 F.2d at 350 n. 8.

The potential applicability of § 2403(b) to this action was first voiced by CTS's counsel at a hearing before Emergency Judge Shadur on April 3, 1986. DCA claims it notified the Indiana attorney general that same day and supplied the attorney general with courtesy copies of relevant pleadings. The attorney general has not responded in the interim. Although DCA maintains that the question of the constitutionality of the Act does not affect the public interest because this case involves only private parties. The court agrees but only in part. While the Indiana Control Shares Acquisitions Act may affect the public interest for purposes of § 2403(b), its impact on the present situation is unique. Therefore, so long as the court confines its discussion to the application of the statute to the facts, and not the validity of the statute itself, the public interest concerns of § 2403(b) are not implicated.

That the Indiana attorney general might have intervened earlier does not change this result. DCA has adequately demonstrated that a significant threat to its Williams Act rights exists so as to justify immediate relief from the statute. This harm is immediate and ongoing, and the effects of applying the statute to this transaction are undisputed. Although DCA has denominated both its Commerce Clause and Supremacy Clause challenges as "facial" challenges to the statute's validity, the applicable cases have persuaded me that the statute's application to DCA under the present circumstances would be unconstitutional under the Supremacy Clause, even if the statute could otherwise be upheld. The court will confine its discussion to the Williams Act issues, since the Commerce Clause challenges, if reached, would

have ramifications beyond the present case, and would therefore not be fairly resolved in the state's absence.

### Supremacy Clause

Article VI, cl. 2, of the United States Constitution provides that "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof, ... shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the contrary notwithstanding." The issue before this court is whether the Indiana Control Share Acquisitions Act as applied in this case frustrates the congressional objectives of the Williams Act amendments to the Securities Exchange Act of 1934, 15 U.S.C. §§ 78m(d)–(e); 78m(d)–(f), so as to fall within the prohibitions of the Supremacy Clause.

As explained in *Edgar v. MITE Corp.,* 457 U.S. at 632, 102 S.Ct. at 2635, and in *Piper v. Chris-Craft Industries, Inc.,* 430 U.S. 1, 22, 97 S.Ct. 926, 939, 51 L.Ed.2d 124 (1977), the Williams Act was passed in response to the increased use of cash tender offers in corporate acquisitions, and to ensure that such devices would be brought within the reach of the disclosure requirements of the federal securities laws. The Act filled a previous regulatory gap by imposing several requirements. First, the Act requires that offerors must, upon commencement of the offer, file detailed information with the SEC, the public, and the target company. 15 U.S.C. § 78n(d)(1). Second, the Act sets forth various timing provisions whereby offerors may close their tenders within 30 days, subject to certain stockholder rights of withdrawal within the first 7 days of a tender and at any time after 60 days of the offer's commencement if the purchase has not been completed. 15 U.S.C. § 78n(d)(5). Third, the Act has some fairness provisions to guarantee that all shares tendered must be purchased for the same price, and that excess shares must be purchased on a pro rata basis. 15 U.S.C. § 78n(d)(6)–(7).

The primary purpose behind the Williams Act was to protect investors by ensuring adequate disclosure of information. *Piper v. Chris-Craft*, 430 U.S. at 35, 97 S.Ct. at 946. *See also Edgar v. MITE Corp.*, 457 U.S. 624, 633, 102 S.Ct. 2629, 2636, 73 L.Ed.2d 269 (1982). As explained in *Great Western United Corp. v. Kidwell*, 577 F.2d 1256, 1276 (5th Cir.1978), *rev'd on other grounds sub nom. Leroy v. Great Western United Corp.*, 443 U.S. 178, 99 S.Ct. 2710, 61 L.Ed.2d 464 (1979), the function of the Act is "to get information to the investor by allowing both the offeror and the incumbent managers of a target company to present fully their arguments and then to let the investor decide for himself." In other words, the goal is to promote shareholder democracy by ensuring a fully informed investing public in corporate control contests.

According to Justice White's plurality opinion in *MITE*, an important characteristic of the legislation under the Williams Act was "to avoid favoring either management or the takeover bidder." 457 U.S. at 633, 102 S.Ct. at 2636. This policy of "evenhandedness" or "neutrality" was implicit in the evolution of the statute, when Congress replaced "avowedly pro-management" disclosure provisions with more neutral requirements which would avoid giving either side additional advantages vis-a-vis the investor in a corporate takeover contest. *Id.* at 633-34, 102 S.Ct. at 2636-37.

The reasons behind this shift are apparent in the legislative history. First, Congress became convinced "that takeover bids should not be discouraged because they serve a useful purpose in providing a check on entrenched but inefficient management." S.Rep. No. 550, 90th Cong., 1st Sess., 3 (1967). Congress also did not want to deny shareholders the opportunity to sell their shares for a premium over market which results "from the competitive bidding for a block of stock of a given company." 113 Cong.Rec. 24666 (1967) (remarks of Sen. Javits). The disclosure provisions were therefore intended to strike a balance between the investor, management, and the takeover bidder by ensuring that each side would have an opportunity to express and explain its position but no more. *See generally MITE*, 457 U.S. at 633-34, 102 S.Ct. at 2636-37.

Whether the policy of neutrality behind the Williams Act was but a characteristic of legislation directed toward investor knowledge, or was an affirmative regulatory goal, is in the abstract debatable. *See MITE Corp. v. Dixon*, 633 F.2d 486, 495 (7th Cir.1980), *aff'd sub nom. Edgar v. MITE Corp.*, 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982). In *MITE*, only three Justices joined Justice White's holding that the Illinois Business Take-Over Act was unconstitutional under the Supremacy Clause. While four Justices simply didn't reach the issue, Justices Powell and Stevens noted that Congress' decision to follow a policy of neutrality was not necessarily "tantamount to a federal prohibition against state legislation designed to provide special protection for incumbent management." 457 U.S. at 655, 102 S.Ct. at 2647 (Stevens, J., concurring); *see also* 457 U.S. at 646-47, 102 S.Ct. at 2642-43 (Powell, J., concurring).

█ Despite the above cautionary signals, the majority of courts since *MITE* have held that state laws which unfairly advantage incumbent management in the context of a battle for corporate control conflict with the Williams Act and are therefore invalid. *See L.P. Acquisition Co. v. Tyson*, 772 F.2d 201, 207-09 (6th Cir.1985); *Cardiff Acquisitions, Inc. v. Hatch*, 751 F.2d 906, 912-14 (8th Cir.1984); *National City Lines v. LLC Corp.*, 687 F.2d 1122 (8th Cir.1982); *Icahn v. Blunt*, 612 F.Supp. 1400, 1418-1420 (W.D.Mo. 1985). *See also MITE Corp. v. Dixon*, 633 F.2d at 495 (noting that in 1980 "most courts" had found state takeover statutes which provide management with a powerful weapon of delay to disrupt the neutrality indispensable for proper operation of the Williams Act). This court sees no need to second-guess these cases simply because the Supreme Court as a whole did not reach the issue, particularly since CTS's

counsel mostly ignores *MITE* in its brief. The court therefore accepts as given the proposition that state legislation which upsets the neutral balance struck by the Williams Act is invalid under the Supremacy Clause.

Justice White's opinion in *MITE*, like that of the Seventh Circuit below, identified three provisions of the Illinois Act that conflicted with the Williams Act: first, the requirement of precommencement disclosure for a tender offer; second, the hearing provisions of the Act; and third, the ability of the Illinois Secretary of State to pass on the substantive fairness of a tender offer. 457 U.S. at 634–640, 102 S.Ct. at 2636–2640. The Court emphasized that the precommencement notification provisions allowed the target company to disseminate information to its shareholders in advance of the offeror's ability to communicate, thereby distinctly favoring management. 457 U.S. at 635, 102 S.Ct. at 2637. The Court further concluded that the hearing provisions of the Act frustrated Congress' purpose by introducing extended delay into the tender offer process. *Id.* at 637, 102 S.Ct. at 2638. The Court held that delay alone can seriously impede a tender offer and that delays beyond what the Williams Act provides would unduly favor the target company's management and thereby frustrate many pro-competitive cash tenders. *Id.* at 637–38, 102 S.Ct. at 2638.

In *Icahn v. Blunt*, 612 F.Supp. 1400 (W.D.Mo.1985), the plaintiff sought injunctive and declaratory relief against the Missouri Control Share Acquisition Statute, a state law somewhat similar to the Indiana legislation at issue here. Under the Missouri statute, a tender offeror seeking to acquire over 20% of a corporation had to deliver an "acquiring person statement" to the target company, which would then have ten days to call a special meeting of shareholders. The meeting itself was to be held no sooner than thirty and no later than fifty days from the date the statement was received. The statute then required that a purchaser could not complete the control acquisition until two-thirds of all outstanding shares and two-thirds of all outstanding shares, excluding interested shares, had voted in favor of the proposed acquisition. 612 F.Supp. at 1406–07.

The district court found that the statute conflicted with the Williams Act in at least three ways. First, the court noted that the statute expressly prevented tender offerors from commencing their offers directly to shareholders until after obtaining the requisite supermajority approval. Second, the court found that the statute's fifty day timing provision prevented offerors from purchasing shares within the deadlines set by the Williams Act. Third, the court noted that the statute implicitly favored management by giving it control over the timing of the meeting and the form of the notice to shareholders; by making exceptions for control share acquisitions which management had approved; and by requiring two-thirds approval of all outstanding shares for control acquisitions, under which system all votes not cast would operate as votes against the potential purchaser. 612 F.Supp. at 1419–20.

■ Under the Indiana Control Share Act, an offeror who wishes to assure acquisition of voting rights prior to close of the tender must notify the target corporation and request a special shareholders' meeting. The timing of the meeting is left to management's discretion so long as it does not exceed 50 days. Thus, the Act allows incumbent management to delay a tender offer well beyond the 20–day timetable of the Williams Act, since the offeror who does not·await such a meeting may acquire no voting rights. Indeed, the statute can be read to prohibit management from acting sooner than 30 days from receipt of the request. *See* § 23–1–42–7(d). Finally, the Act requires that the offeror finance the expenses of the meeting within ten days from the request.

DCA argues that to coordinate a tender offer with the Indiana Act the offeror must tip its hand by filing an acquiring person statement with the target company at least 10 and possibly as much as 30 days before announcing the tender offer, thus creating

the kind of pre-offer notification struck down in *MITE*. The court does not interpret the statute in this manner. The offensiveness of the provision in *MITE* was the one-sidedness of the rules regarding pre-commencement communications to shareholders: only management was allowed to make such communications. In this case, the offeror can avoid any one-sidedness by announcing its offer and holding it open for a longer period.

CTS argues that the Indiana statute, by putting the vote to "non-interested" shareholders rather than to management, fully comports with the Williams Act's policy of strict neutrality between the incumbent management and the prospective acquiror. However, the Illinois Act struck down in *MITE* put the decision on fairness in the hands of state officials, not management, yet the Supreme Court found management's ability to capitalize on the process for delaying purposes was itself enough to frustrate Congress' objectives. Under the Indiana statute, incumbent management has control over the time and execution of the special shareholders' meeting. In *MITE*, the Supreme Court indicated that state laws which build extended delays into the tender offer process are themselves in conflict with federal law. 457 U.S. at 637–38, 102 S.Ct. at 2638. Thus, delay alone may conflict with the congressional goals since "the takeover bidder should be free to move forward within the time frame provided by Congress." *Id.* at 634, 102 S.Ct. at 2636. In this case, however, the delay is admittedly not indefinite, as was the case in *MITE*.

CTS' argument is secondly weak in that the Indiana Act does not wholly exclude "interested" parties from voting. The acquiring person must get not only a majority of disinterested votes, but also a majority of each voting group entitled to vote separately. § 23–1–42–9(b). The latter provision makes no exceptions for interested shares, and thus the statute thus would appear to operate exactly as did the Missouri statute in requiring both a majority of all shares as well as a majority of disin-terested shares before allowing a control share acquisition.

Finally, "interested shares" do not exclude all members of the Board of Directors, only those directors who are also officers or employees of the corporation. § 23–1–42–3. In this case, DCA apparently desires to sweep out all existing directors, a majority of whom are outsiders and who therefore would be allowed to vote any shares they own. Thus, there is an apparent potential for interested parties being allowed to vote their shares. The parties have not presented evidence, however, as to whether the outside CTS directors have substantial or any holdings of CTS stock.

CTS also argues that the opinion in *Icahn* is not controlling because the Missouri statute struck down in that case directly blocked the acquisition of shares, whereas the Indiana Act governs only the acquisition of voting rights. Therefore, CTS argues that the statute no more conflicts with the Williams Act than do state laws regulating voting rights (such as laws requiring super-majority approval for fundamental corporate changes) which also have a deterrent effect on the desirability of cash tender offers.

This argument, superficially persuasive in certain respects, is nonetheless misleading. Voting rights, after all, are an integral part of the ownership interest purchased along with a stock certificate. By limiting the rights that a tender offeror can purchase in a control acquisition, the Indiana Act deprives the transaction of all value and therefore blocks the transaction in practical terms as much as would a direct prohibition on control acquisition. Moreover, as noted in *MITE* in the context of a commerce clause discussion, "[t]ender offers contemplate transfers of stock by stockholders to a third party and do not themselves implicate the internal affairs of the target company." 457 U.S. at 645, 102 S.Ct. at 2642. The implications of this statement for Williams Act purposes were expressed in *Icahn*, where the district court found that taking the decision to buy or sell "out of the shareholder and the

purchaser" and placing it "in the hands of management and other stockholders" created a direct conflict with § 13 of the Williams Act. 612 F.Supp. at 1420. The Indiana statute is barely distinguishable from the Missouri statute in this regard.

CTS has also suggested that Congress last year rejected the need for federal oversight of internal corporate affairs, and that to interpret the Williams Act as governing the transfers of voting rights would do violence to Congress' intent. In 1984, a bill, H.R. 5693, was introduced in Congress that would have restricted the authority of a corporation's board of directors in adopting defensive tactics in takeover contests. The bill was scheduled for a vote by the House in August of 1984. *See Annual Review of Federal Securities Regulation,* 40 Bus.Law. 977, 1020 (1985). By letter of September 25, 1984, however, Secretary of the Treasury Donald Regan advised the House that the bill would intrude unnecessarily into state law, and "constitute an unwarranted step toward imposition of a substantive federal corporation law." 16 Sec.Reg.L.Rep. No. 38 (BNA 1984). In response to the above, the bill was removed from consideration by the House. *Annual Review, supra,* at 1021.

From this legislative history CTS argues that Congress has implicitly decided not to usurp the states' exclusive role of regulating internal corporate affairs. The court, after careful consideration, disagrees as far as this case is concerned. Aside from the usual difficulties involved in ascertaining legislative intent from non-action, there is a serious difference between federal legislation which would restrict the defensive tactics of corporate directors in responding to a takeover offer, and federal legislation which restricts the states from using the force of state law to ensure that corporate takeover contests rarely occur except with management's permission. Corporate directors, after all, are subject to fiduciary duties whereby shareholders can challenge their actions as being contrary to the best interests of the corporation: when state law authorizes the defensive maneuver, however, this check on managerial self-interest is absent. Thus, Congress' decision not to interfere in matters of internal corporate governance is fully consistent with a determination that states should not unduly favor management in legislation concerning corporate acquisitions.

This court ultimately need not decide, however, whether the Indiana legislature's attempt to regulate only voting rights and not share acquisitions themselves might be permissible in other cases, nor whether the 50–day delaying provision is itself enough to find the statute in conflict with the Williams Act. In the present fact situation, application of the Indiana Control Shares Act would not merely delay DCA's attempted offer, but would clearly undo it. DCA made its tender on March 14, 1986, with the intention of closing on April 10, 1986 and being able to vote the shares along with any received proxies two weeks later at the April 25th annual shareholders' meeting. Under the Act, however, DCA cannot vote any of the shares it acquires pursuant to the tender offer unless and until a majority of the CTS shareholders vote to extend voting rights to those shares. Because CTS only opted into the statute on March 27, 1986, thus preventing DCA from requesting a meeting sooner, DCA will be prevented from voting its shares until *after* the April 25, 1986 shareholders' meeting, at which point the shares would have lost all value to DCA.

Such a situation wholly frustrates the purpose and objective of Congress in striking a balance between the investor, management, and the takeover bidder in takeover contests. As expressed in *MITE,* the Williams Act's principle of neutrality derives from congressional determination that takeover bids frequently advance shareholder welfare. 457 U.S. at 633, 102 S.Ct. at 2636. Under the Indiana Control Shares Act as applied to this case, however, DCA's contest for control would be over before it had begun. Such a result cannot be squared with Congress' policy. The court therefore finds that the statute is unconstitutional as applied to the facts of

this case, and that DCA is entitled to declaratory relief.

### Conclusion

Accordingly, DCA's motion for declaratory relief on Count VIII of the third amended complaint is granted: the Indiana Control Shares Acquisition Act may not constitutionally be applied to prevent DCA from voting any shares acquired through its tender offer at the April 25, 1986 shareholders meeting.

It is so ordered.

## ON MOTION TO CERTIFY OPINION FOR IMMEDIATE APPEAL

The facts underlying this action are fully set forth in this court's memorandum opinion and order of April 9, 1986, and will not be repeated here. On that date, this court held unconstitutional as applied to this case the Indiana Control Shares Acquisition Act, a state statute which by its terms would have operated to prevent plaintiff Dynamics Corporation of America ("DCA") from voting any of the stock acquired through an ongoing tender offer for the stock of defendant CTS Corporation ("CTS"). Because the Indiana Attorney General had not been properly certified pursuant to 28 U.S.C. § 2403(b), this court limited its discussion to the plaintiff's Williams Act and Supremacy Clause challenges to the statute and based its decision on the facts of this case. The Indiana Attorney General was notified of this litigation and given copies of relevant pleadings on April 3, 1986, but he has not sought to intervene in this action nor submitted any statement of position.

CTS has now moved to certify the April 9, 1986 opinion for immediate appeal under Fed.R.Civ.P. 54(b). The court agrees that there is no just cause for delay, but is concerned that the Court of Appeals, were it to reverse, would simply remand for resolution of the Commerce Clause issues left unresolved in the court's former opinion. Because a draft on those issues had been previously prepared, but was not issued due to § 2403(b) concerns, the court has decided to rule on the alternative grounds despite the state's failure to intervene. In this way, the court intends to provide a record whereby the entire controversy over the effectiveness of the Act can be definitively resolved on appeal. The court will also certify the appeal to the Indiana Attorney General under § 2403(b) so that the state will have an opportunity to intervene before the Seventh Circuit. *Cf. Merrill v. Town of Addison,* 763 F.2d 80, 83 (2d Cir. 1985) (purposes of § 2403(b) certification can be satisfied at appellate level).

Both the mechanics of the Indiana statute and various procedural objections voiced by defendants were thoroughly discussed in this court's previous opinion. Because the present opinion is best understood as an amendment or addition to that earlier opinion, those discussions will not be repeated again today.

### Commerce Clause

The Commerce Clause of the United States Constitution, Art. 1, § 8, cl. 3, provides that "Congress shall have power ...[t]o regulate commerce ... among the several states." Although the clause by its terms refers to congressional power only, it has been long held that the Clause, even without implementing legislation by Congress, acts as a limitation upon state power. *Great Atlantic & Pacific Tea Co. v. Cottrell,* 424 U.S. 366, 370–71, 96 S.Ct. 923, 927–28, 47 L.Ed.2d 55 (1976); *Freeman v. Hewitt,* 329 U.S. 249, 252, 67 S.Ct. 274, 276, 91 L.Ed. 265 (1946); *Cooley v. Board of Wardens,* 53 U.S. (12 How.) 299, 13 L.Ed. 996 (1851). A state statute which incidentally regulates interstate commerce will be upheld "unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970), citing *Huron Portland Cement Co. v. Detroit,* 362 U.S. 440, 443, 80 S.Ct. 813, 815, 4 L.Ed.2d 852 (1960). *Direct* regulation of interstate commerce by the states, however, is prohibited. *Pike,* 397 U.S. at 142, 90 S.Ct. at 847; *Shafer v. Farmers Grain Co.,* 268 U.S. 189, 199, 45 S.Ct. 481, 485, 69 L.Ed. 909 (1925).

In *Edgar v. MITE Corp.*, 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982), the Supreme Court addressed the constitutionality of the Illinois Business Takeover Act. That Act contained several provisions designed to regulate tender offers for corporations which met two of the following conditions: the corporation had its principal office in Illinois, was organized under Illinois law, or had at least 10% of its stated capital and paid-in surplus represented in Illinois. 457 U.S. at 627, 642. In such circumstances, the Act required an offeror to notify the Illinois Secretary of State of its intention to make a tender offer 20 days before the offer became effective and prevented the offeror from communicating with shareholders during that time. 457 U.S. at 635, 102 S.Ct. at 2637. Second, the Act permitted the Illinois Secretary of State to hold a hearing to adjudicate the substantive fairness of the tender offer, and in fact required the Secretary of State to call such a hearing if requested to do so by persons holding 10% of the oustanding shares. *Id.* at 627, 102 S.Ct. at 2632. If the Secretary after hearing determined that the offer was unfair, he could deny registration. *Id.*

A plurality of the Court struck down the statute as unconstitutional under both prongs of the Commerce Clause analysis.[1] First, the Court held that the Illinois Act directly regulated and prevented interstate tender offers which in turn would generate interstate transactions. The Court noted that the legislation directly regulated interstate transactions, since tender offers are ordinarily communicated and consummated by means of interstate commerce nationwide, and that the Act could be applied to regulate tender offers and to prevent stock transactions which would take place wholly outside the State of Illinois. 457 U.S. at 641–42, 102 S.Ct. at 2640–41.

Second, a majority of the Court held that the burdens imposed by the Act on interstate commerce were excessive in light of the local interests the Act purported to further. 457 U.S. at 640, 102 S.Ct. at 2639.[2] The Court found that the statute effectively enabled the Illinois Secretary of State to block a nationwide tender offer, thereby removing the incentive that tender offers provide to ensure the efficient performance of incumbent management, and that the asserted local interests—the protection of resident security holders and the regulation of internal corporate affairs— were insufficient to outweigh those burdens given the Act's effects on nonresident shareholders and non-Illinois corporations. *Id.* at 643–44, 102 S.Ct. at 2641–42.

Two district courts have applied the holding of *MITE* to find other control share acquisition acts unconstitutional under the Commerce Clause. In *APL Limited Partnership v. Van Dusen, Inc.*, 622 F.Supp. 1216 (D.Minn.1985), the district court found the Minnesota Control Share Acquisition Act to pose an unreasonable burden on interstate commerce. That statute regulated tender offers for shares in corporations organized under Minnesota law with either their principal place of business or $1,000,- 000 in assets within the state. The statute required acquirors to disclose certain information to shareholders of the target corporation and permitted the shareholders to block the acquisition through a stockholders vote. The court found the putative local benefits insufficient to outweigh the severe effects on nonresident stockholders who might wish to tender their shares for a premium.

---

**1.** Justice White delivered the opinion for the Court, in which only the Chief Justice joined. Justice Blackmun joined in the opinion only on Williams Act preemption grounds; whereas Justices Stevens and O'Connor concurred in Justice White's commerce clause analysis. Justice Powell's concurrence was limited to Part V–B of the opinion. 457 U.S. at 646, 102 S.Ct. at 2642. That part relied on the argument that the statute's indirect burdens on interstate commerce outweighed its local benefits. Justices Marshall, Brennan, and Rehnquist dissented on mootness grounds.

**2.** The majority votes were Justices White, Powell, O'Connor, Stevens, and the Chief Justice. *See supra* footnote 1.

In *Icahn v. Blunt*, 612 F.Supp. 1400 (W.D.Mo.1985), the court found the Missouri Control Share Acquisition Statute, which like the Minnesota statute gave the shareholders power to block a 20% acquisition, an impermissible attempt to assert extraterritorial jurisdiction over nonresident persons and property. The court stressed that the statute was applicable to foreign corporations, was not limited in effect to in-state shareholders, and was therefore a direct regulation of interstate commerce. The court also found that the statute was unconstitutional under the balancing test of *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970) since the burden imposed on interstate commerce was excessive in relation to the local interests served.

*Whether IND.CODE § 23-1-42 directly burdens interstate commerce.*

DCA argues that the Indiana Control Shares Acquisition Act directly regulates interstate commerce in the following ways:

(1) it permits target company management to strip the voting rights from shares acquired in out-of-state transactions;

(2) it can be invoked by the management of out-of-state companies;

(3) it permits target company management to effectively block successful interstate tender offers.

CTS, in contrast, argues that the statute does not directly regulate tender offers but merely governs the internal relations between existing shareholders once the shares have been acquired. Therefore, CTS argues that the statute is no different from other voting-rights provisions, such as supermajority requirements or cumulative voting, which govern internal corporate affairs.

There is a superficial persuasiveness to CTS's argument. Unlike the statutes in *APL* and *Icahn*, the Indiana Control Shares Acquisition Act does not give shareholders the power to block control acquisitions altogether, but only gives power to block the acquisition of voting rights in connection with those shares. Indeed, the *APL* court,

in holding that the acquisition of shares does not implicate internal corporate matters, expressly distinguished state regulations over the exercise of power resulting from an acquisition. 622 F.Supp. at 1223–24. Therefore, CTS argues that the effect on interstate commerce is incidental at best, and that the statute no more deters purchases of stock in Indiana corporations than do laws requiring supermajority shareholder approvals for fundamental corporate changes.

As I noted in my April 9, 1986 opinion, however, this argument ignores the basic fact that voting rights are an integral part of the ownership interest purchased along with a stock certificate. See Mem.Op. & Order at 398. By limiting the rights that a tender offeror can purchase in a control acquisition, the Indiana statute deters tender offers and thereby burdens interstate commerce as much as if the statute blocked the transaction altogether. The statute does not govern the exercise of control share voting power, but prevents the power from ever becoming acquired except upon specified events. Moreover, by providing for automatic redemption privileges when offerors fail to file an acquiring person statement in advance of purchase, the Act further regulates interstate tender offers. Indiana cannot recast regulation of tender offers as internal corporate governance by allowing the transaction to go forward but depriving it of value. In either event, the statute undeniably "regulates" interstate commerce by restricting the sale and purchase of stock in interstate transactions.

■ Moreover, the Act appears by its express terms not to be limited to Indiana corporations. An "issuing public corporation" need only have "substantial assets" in Indiana and 10,000 resident Indiana shareholders for the statute to apply. IND.CODE § 23-1-42-4(a). While the statute generally defines "corporation" as a "corporation for profit that is not a foreign corporation, incorporated under or subject to provisions of this article," § 23-1-20-5, the statute is also intended by its

general terms to apply to "all foreign corporations that want to transact business in Indiana" after July 31, 1987. § 23–1–17–4. Thus, foreign corporations which have up to 90% of their shares owned by non-Indiana residents or which have up to 90% of their shareholders residing elsewhere would be "under or subject to provisions of this article" for purposes of § 23–1–20–5 so long as they transact business in Indiana. As noted in *MITE,* the Commerce Clause precludes the application of a state statute to commerce that takes place wholly outside the state's borders. 457 U.S. at 642–43, 102 S.Ct. at 2640–41. Because the Indiana Control Shares Acquisition Act can be used to regulate stock transactions between non-Indiana residents and a non-Indiana acquiror, it presents the same constitutional infirmities which caused the Supreme Court to strike down the Illinois Takeover statute in *MITE.*

The statute's application to nonresident corporations is not without some ambiguity. Until August 1, 1987, the Act does not apply to domestic corporations unless their board of directors adopts a resolution electing to be governed by the statute. § 23–1–17–3(b). Since the statute does not give foreign corporations this option, it is possible, by negative implication, to read the statute as not governing foreign corporations for the time being. While such a reading is unlikely, given the specific definition of "issuing public corporation," the court addresses this possibility.

Assuming, *arguendo,* that the Act applies only to Indiana corporations up till August 1, 1987, this alone might not save the statute from constitutional infirmity. First, the statutory mandate to regulate out-of-state corporations as of August 1, 1987 is clear; the court seriously doubts that any postponements of that power can be used to disguise the nature of the legislature's true intent, or to recharacterize the statute's effects. Second, even were the statute limited to Indiana corporations, by operation it directly interferes with transactions between nonresident shareholders in an Indiana corporation and non-Indiana offerors. As noted in *APL,* "regulation of

*shareholders*— and those who would become shareholders—is not the same as regulating the corporation itself." 622 F.Supp. at 1223 (emphasis in original). Because the issue is arguable, because the court has not heard from the Indiana Attorney General, and because *MITE'*s "direct regulation" holding commanded only a plurality of Supreme Court Justices, the court examines whether the putative local benefits of the statute outweigh its burden on interstate commerce.

*Whether the burden of IND.CODE § 23–1–42 on Interstate Commerce Outweighs its Local Benefits.*

DCA argues that even if the Indiana Control Shares Acquisition Act does not directly burden interstate commerce, its indirect burdens far outweigh any local benefits. The parties agree that the applicable test for determining this question is that set forth in *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970):

> Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be prompted as well with a lesser impact on interstate activities.

As emphasized in *Edgar v. MITE Corp.,* 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982), moreover, the mere articulation of a legitimate local interest cannot alone justify a burden on interstate commerce: rather, the court must question whether the interest will in fact be furthered by the statute. Therefore, the test is more appropriately characterized as weighing local *benefits* rather than local *interests* against

interstate burdens. *See APL*, 622 F.Supp. at 1221.

With this teaching in mind, it is necessary to examine the local interests behind the Indiana Control Shares Acquisition Act. This task is rendered somewhat difficult by the fact that there is no legislative history before the court, and the statute nowhere articulates the local interests it purports to serve. CTS chiefly argues that the Act simply regulates the relations between existing shareholders and that the state legislature intended to fulfill its traditional duty of regulating corporations in a manner that promotes fair treatment of all shareholders and shareholder control over fundamental corporate events.

The court agrees that Indiana has a legitimate right to govern the internal affairs of its corporations. In *MITE*, however, the Supreme Court noted that internal corporate governance was an inadequate justification for burdening interstate commerce when the statute in question applied to nonresident as well as resident corporations. 457 U.S. at 645, 102 S.Ct. at 2642. Here, the Indiana statute by its terms applies not only to Indiana corporations but to corporations with "substantial assets" in Indiana and for which only 10% of the outstanding shares or 10,000 shares (whichever is smaller) are owned by Indiana residents. The statute is thus clearly overbroad in relation to the putative local interest of internal corporate regulation. Moreover, the application of the statute to nonresident corporations, as in *MITE*, makes CTS's "proposed ... justification somewhat incredible." *Id.*

Second, it is questionable in any event whether internal corporate governance can be legitimately invoked to justify regulation of stock transactions. As noted in *MITE*, "[t]ender offers contemplate transfers of stock by stockholders to a third party and do not themselves implicate the internal affairs of the target company." 457 U.S. at 645, 102 S.Ct. at 2642. *Accord, APL*, 622 F.Supp. at 1223 (distinguishing regulation of shareholders from regulating the corporation itself). CTS nonetheless argues that the Indiana Act avoids this problem by regulating only the acquisition of voting power, and not the acquisition of the shares themselves.

As I noted earlier, the distinction between acquisition of shares and acquisition of votes is deceptive. The value of the shares in control acquisitions is inseparable from their voting power, and Indiana should not be allowed to burden interstate tender offers by vetoing voting power any more than it should be allowed to give shareholders veto power over the acquisition itself. Thus, while a state may legitimately regulate the exercise of corporate power once control shares have been acquired, it may not prevent the acquisition of power through out-of-state transactions simply because local interests are affected.

CTS places particular reliance on the passage of *APL* which distinguishes between the acquisition of shares and the exercise of power as a result of that acquisition: "The acquisition of shares does not implicate the internal affairs of the target corporation. The use of that power *once the shares have been acquired* may well be a proper subject of state regulation, but that is not what the MCSAA regulates." 622 F.Supp. at 1223–24. (emphasis in original). CTS maintains that because the Indiana Act regulates the post-acquisition power of control shares and not their purchase, the statute falls on the other side of the distinction drawn in *APL*.

The court disagrees. The passage in *APL* appears to distinguish between rules which regulate the power majority shareholders enjoy over minority shareholders on the one hand and rules which regulate the transferring of shares and of power on the other. The Indiana Business Corporation Law already contains provisions which impose fiduciary duties on majority or controlling stockholders. Thus, it is difficult to see what rational basis is served by directly regulating the transfer of power. Indeed, the statute does not require shareholder approval for the transfer of voting power from one majority group to another, § 23–1–42–2(e), even though the same fidu-

ciary concerns would presumably be triggered. This too undercuts the purported state interest articulated by CTS.

In sum, the Indiana Act, by stripping away voting power from new control shares until the majority of "disinterested" shareholders subsequently approves, significantly interferes with the interstate market for corporate control and limits the rights which can be transferred in that market. That interference cannot be justified on the grounds of local interests which are not evenhandedly served by the statute and which are apparently protected elsewhere under Indiana law.

Although CTS does not advance the argument, there are two other conceivable state interests behind the Control Shares Acquisition Act. First is the state's concern in protecting local shareholders. Some such concern can be evidenced from the Act's requirement that issuing public corporations have specified numbers or percentages of Indiana shareholders in order to fall within the Act's provisions. The statute appears not to be limited in its effects to Indiana shareholders, however, in contrast to the antitakeover statutes which passed constitutional muster in *L.P. Acquisition Co. v. Tyson,* 772 F.2d 201 (6th Cir.1985) and *Cardiff Acquisitions, Inc. v. Hatch,* 751 F.2d 906 (8th Cir.1984). Because Indiana has "no legitimate interest in protecting nonresident shareholders," there is "nothing to be weighed in the balance" to sustain the law as it applies to transactions solely between non-Indiana residents. *See MITE,* 457 U.S. at 644, 102 S.Ct. at 2641; *APL,* 622 F.Supp. at 1222; *Icahn,* 612 F.Supp. at 1417.

In *MITE, Icahn,* and *APL,* the statutes in question applied to corporations even though there were *no* resident shareholders. CTS might therefore argue that the Indiana Control Shares Act is distinguishable because of the substantial number of Indiana shareholders who must be affected before the statute operates. The problem with this argument is that the statute's 10% or 10,000 floor still allows for substantial interference in a transaction where up

to 90% of the affected shareholders reside outside Indiana. As noted in *Pike v. Bruce Church,* the extent of a permissible burden on interstate commerce depends not only on the nature of the local interest involved, but on whether that interest "could be protected as well with a lesser impact on interstate activity." 397 U.S. at 142, 90 S.Ct. at 847. Because Indiana could achieve its goal of protecting in-state shareholders without regulating transactions solely between nonresidents, the Act's effect on interstate commerce exceeds the scope reasonably necessary for protecting Indiana residents.

Even if the Indiana Act were construed to be limited to in-state shareholders, substantial questions would remain whether the benefits to local shareholders actually outweighed the burden on commerce. In *MITE,* the Supreme Court concluded that the benefit to Illinois shareholders from increased disclosure burdens was "for the most part speculative" where the Act increased the risk that an interstate tender offer would fail due to defensive tactics employed by incumbent management. *Id.* 457 U.S. at 645, 102 S.Ct. at 2642. In this case, the concern for shareholder welfare presents similar problems, since the Act protects shareholders only at the expense of deterring tender offers. Since other state laws already protect shareholders against majority shareholder misconduct, and since both state and federal laws leave corporate boards free to take reasonable defensive measures against takeovers when in the best interest of the shareholders, the need for added protection against control acquisitions is indeed somewhat speculative. The court does not rely on this analysis, however, since the Act's extension to nonresident shareholders is clear.

A final state goal possibly served by the Control Shares Acquisition Act would be Indiana's interest in protecting its business climate. CTS does not advance this argument, however, and the court finds the argument weak for the reasons set forth in *APL* and *Icahn.* In those cases, Minnesota

and Missouri, respectively, argued that they had a legitimate interest in protecting corporations which do significant business in-state from acquisitions which might disrupt that business. The Courts found such an argument to be based on the unsubstantiated assumption that a person who acquires 20% of a local corporation's voting stock is likely to harm the state's business climate. The Courts further found the arguments weak in that neither state had attempted to restrain incumbent management from taking actions which might adversely affect the state business climate. *See APL,* 622 F.Supp. at 1223; *Icahn,* 612 F.Supp. at 1417. Both of those arguments are fully applicable to the present case.

In sum, then, the court finds that the substantial interference with interstate commerce created by the Indiana Control Shares Acquisition Act outweighs the articulated local benefits so as to create an impermissible indirect burden on interstate commerce.

### Conclusion

The court amends its April 9, 1986 opinion to add additional grounds for granting judgment to the plaintiff on Count VIII of its third amended complaint, and, finding no just cause for delay, certifies the judgment for immediate appeal under Fed.R. Civ.P. 54(b). The court also certifies the appeal under 28 U.S.C. § 2403(b) to the Indiana Attorney General for purposes of intervention. Plaintiff DCA, as the party raising the constitutional challenges, is charged with the responsibility of today notifying the appropriate state officials of this court's judgment and the appeal.

It is so ordered.